229 P.2d 692

**DENNIS v. JORDAN et al.**

No. 5408.

Supreme Court of Arizona.

April 2, 1951.

Rehearing Denied April 24, 1951.

claimed by the Governor, Laws of Arizona 1949, pp. 325–344, to have been enacted at the general election November 2, 1948 and now designated as Sections 12–801 to 12–828, inclusive, Cum.Pocket Supp., A.C.A. 1939.

To employees on the State payroll prior to July 1, 1949 the Act represented:

1. that a Fund would be established, Sections 3, 5, 23 and 24, to which the State would contribute an annual sum sufficient (a) to make up the difference between the cost of retirement benefits and the 5% salary deductions of employees, (b) to meet the full cost of Death, Ordinary Disability, Accidental Disability, and Accidental Death benefits, and (c) to cover administration costs, and that the first sum would be paid by the State into the Fund "in the month of July 1949".

2. that benefit payments would begin January 1, 1950, Sec. 3, at which time Retirement, Sec. 8, Death, Sec. 11, Ordinary Disability, Sec. 12, Accidental Disability, Sec. 13, and Accidental Death, Sec. 14, benefits would become payable to state employees.

Notwithstanding what was represented:

(a) Subsequent to enactment of the Act November 2, 1948, the Nineteenth Legislature, regular session, had before it the matter of an appropriation for the "state employees' retirement fund" (Governor's Budget Message, January 24, 1949). The regular session convened January 10, 1949

Whitney, Ironside & Whitney, Phoenix, for appellant.

Fred O. Wilson, Atty. Gen., Perry M. Ling, Chief Asst. Atty. Gen., Earl Anderson and Richard C. Briney, Asst. Attys. Gen., Lynn M. Laney, Associate Counsel, and William P. Mahoney, Jr., Phoenix, of counsel, for appellees.

LA PRADE, Justice.

This is an appeal from the judgment of the lower court sustaining the constitutionality of the Public Employees' Retirement Act, proposed by initiative petition and pro-

434

and adjourned March 19, 1949, making no such appropriation.

(b) The board of trustees (general administration board for the retirement fund) held its first and second official meetings on July 1 and July 11, 1949, respectively. One of the members of the board presented her claim for expenses to the state auditor, which claim was rejected upon the ground that no appropriation had been made therefor. The rejection of this claim was the basis for an action instituted in the Superior Court of Maricopa County on the 10th day of August, 1949, seeking an interpretation of the law and specifically, whether the Act appropriated funds to meet the expenses of administration. Summary judgment was entered, holding among other things that the Act provided no appropriation which was available to meet expenses of the trustees and that the legislature having made no appropriation therefor, there were no funds available for the payment of such claims.

(c) During the pendency of an appeal to this court challenging this judgment, the Governor by his proclamation of February 13, 1950 called the legislature into special session, which was regularly convened on February 20, 1950. Listed as one of the items for consideration was an item entitled: "Public Officers' and Employees' Retirement". HB 38 and HB 39 of that session were introduced February 24, 1950 and respectively sought an appropriation of $1,190,000 as an initial contribution to the Fund by the State and an appropriation of $42,800 for initial administrative expenses. Neither bill was passed.

(d) On April 3, 1950 this court handed down its decision on the appeal above referred to, being Eide v. Frohmiller, 70 Ariz. 128, 216 P.2d 726, affirming the judgment of the lower court decreeing that no appropriation had been made by the provisions of the Act to pay administration expenses.

(e) In March, 1950 the present action was instituted in the Superior Court of Maricopa County, resulting in the judgment here under consideration and which was submitted for decision in this court on the 23rd day of January, 1951.

(f) The Twentieth Legislature having met in regular session on the 8th day of January, 1951, it was deemed advisable, in view of the public interest and monetary considerations involved, to attempt to dispose of the case prior to the adjournment of the legislature in order that it might be fully advised in the premises. (The legislature adjourned without making any appropriation to activate the Fund.) Due to the enormity of the considerations involved, the extensive briefs and the multitude of objections raised as to the constitutionality of the Act, the court found itself unable to prepare a written decision prior to the date that the legislature was scheduled to adjourn.

After its submission (January 23) every member of the court laid all other matters

under consideration to one side and assiduously, individually and collectively, studied the case and the disposition to be made of it. On February 28th, without written decision, the court directed the filing of the following minute entry:

"The judgment of the lower court, denying a peremptory writ of mandamus to the plaintiff (appellant), is affirmed. The petition of plaintiff was in her capacity as a state employee, and the judgment denying the writ only adjudicated her rights as an employee of the state. In the court below, and here, the constitutionality of the Act as a whole has been challenged. The court will hand down its written decision as soon as it is possible to complete the same, holding the Act constitutional in so far as it applies to employees of the state. The opinion will expressly reserve passing upon the validity of the Act in so far as it attempts to provide for participation in the fund by persons employed by the political subdivisions of the state including counties, cities, towns, school districts, and employees of the political subdivisions of the state now participating in existing retirement and pension funds.

"The reservation referred to will be made for the reason that no political subdivision of the state, or other persons that might be affected, are before the court, and their rights and obligations under the Act cannot properly be adjudicated in this proceeding."

Now, in conformity with the Constitution, art. 6, section 2, the court is filing its written decision, giving the grounds for its decision as contained in the minute entry.

Plaintiff below, an employee of the department of library and archives of the state of Arizona, whose director is the appellee Mulford Winsor, initiated this action in the Superior Court of Maricopa County against the state auditor, and Mulford Winsor, director aforesaid, seeking to secure a peremptory writ of mandamus directed to the auditor and director, commanding them to approve and cause to be paid to plaintiff the 5% theretofore taken from her wages and to cease preparing and causing to be prepared any state payrolls from which any deduction had been made from the employee's wages. Semimonthly wage payment, Section 43-1601, A.C.A. 1939; auditor to issue warrants, Laws 1943, Chapter 86, Section 10-926, A.C.A.1939, Cum.Supp.

Appellees' answer contained three defenses:

(1) lack of jurisdiction over the subject matter;

(2) failure of complainant to state a claim upon which relief could be granted; and

(3) defensive admissions, denials, and allegations, the net substance of which constitutes a denial that the Act was unconstitutional and that appellant, by virtue of the provisions of the Act, had voluntarily

elected to and did become a member of the Fund and could not challenge the constitutionality of the Act.

The court below held (1) that the plaintiff had no legal standing to maintain the action, and (2) that the Act was valid and constitutional.

Appellant's first two assignments of error challenge the judgment in so far as it held that the plaintiff was not entitled to maintain the action and was not a proper party to question the constitutionality of the Act. Appellees, deeming that the public interest requires that the supreme court decide the constitutionality of the Act (and accordingly with the court's permission), withdrew their contention that the plaintiff had no legal standing to maintain the action and was not a proper party to question the constitutionality of the Act.

By the third assignment of error it is said that the Act is unconstitutional and void because the Act "was not initiated, petitioned for, submitted or referred to a vote of the people or enacted in conformity with the requirements of Article 4, part 1, Section 1, paragraphs (9), (10), (11), and Article 22, Section 14 of the Arizona Constitution and Sections 60–103, 60–107, A.C.A. 1939."

Section 60–107(a), A.C.A.1939, which implements Article 4, part 1, Section 1, paragraph (11), of the Constitution, commands that the voters be advised in the official publicity pamphlet as to the full and correct title and the form in which said measure will appear on the ballot.

The basis for the assignment of error challenging the sufficiency of the title to the Act, has its origin in the following factual situation, recited chronologically:

1. On June 30, 1948 there was filed with the Secretary of State an Initiative Petition in which the full and correct title of the measure proposed under the Initiative was:

"To Establish a Public Employees' Retirement Fund to Provide Retirement, Disability, Death and Withdrawal Benefits for Officers and Employees of the State of Arizona, and of Political Subdivisions of the State of Arizona Including Counties, Cities, Towns, and School Corporations; to Provide for Participation in the Fund by Persons Employed Jointly by the State of Arizona, Its Political Subdivisions, Municipalities and Federal Agencies; to Provide for the Maintenance and Administration of the Fund; to Prescribe the Procedures Whereby Political Subdivisions may Participate in the Fund on Behalf of Their Employees and Employees of Institutions, Boards, Commissions, Officers, Bureaus or Any Other Agencies Maintained by a Political Subdivision; to Prescribe the Method for Inclusion of Certain Existing Retirement and Pension Funds; and to Provide the Method of Financing the Fund."

2. The Official Publicity Pamphlet for the November 1948 election stated:

"The following is the form and number in which the question will be printed on the Official Ballot:

"Proposed by Initiative Petition

"Relating to Public Employees; Providing for Retirement Fund; for Participation in Fund by Employees and for Retirement, Disability and Death Benefits."

"To Establish a Public Employees' Retirement Fund * * *", etc., setting out the full initiated title immediately supra.

3. On the November 2, 1948 Official Ballot was this title:

"Relating to Public Employees; Providing for Retirement Fund; for Participation in Fund by Employees and for Retirement, Disability and Death Benefits." (which title hereinafter is referred to as "ballot title"); that the true title was not printed on the Official Ballot; and that no initiative petitions filed with the Secretary of State bore the ballot title.

4. The Official Canvass shows that the General Election vote of November 2, 1948 was on an initiative measure, the title of which was the ballot title, and,

5. On November 22, 1948, the Governor, by his proclamation, duly proclaimed the Public Employees' Retirement Act to be the law, *and incorporated in and preceding the Act there appears the correct title, being the title carried on the initiative petitions.*

In other words, the enrolled initiated Act does have the correct title though it was not the ballot title.

■ It follows that the court will not consider whether there was a deviation (constitutional defect) in the proceedings leading to the final passage of the Act but will only examine the Act as initiated and as proclaimed by the Governor. Hernandez v. Frohmiller, 68 Ariz. 242, 204 P. 2d 854. In the latter case, a comparable fact situation existed in that the abbreviated ballot title was not identical with the initiated title which had been incorporated as the true title in the Governor's proclamation. In that case we unequivocally invoked "the enrolled Bill rule", following our earlier decision in the case of Allen v. State, 14 Ariz. 458, 130 P. 1114; 44 L.R.A.,N.S., 468. This last named case exhaustively treats the reasons for holding that once a law has been passed and duly promulgated, it is conclusively presumed to have been regularly enacted and is invulnerable to attack upon the ground of a defective title appearing upon the ballot. Nothing can be gained by reconsidering the question, as recourse to the latter two cases fully demonstrates the reasons for the rule to which we are committed. It is entirely beside the point at this stage of the proceedings, to consider, as asserted by appellant, that the voters were deceived and misled by the title. The Act, in its proclaimed form, is the law that the court

438

will examine in proceedings to determine its constitutionality or interpretation.

The second group of objections to the Act is that there are embraced therein subjects which are not expressed in its title as commanded by Article 4, part 2, Section 13 of the Constitution, supra. The subject matters alleged to be foreign to the title, are:

(1) Compulsory retirement of public employees;

(2) Use of public moneys for benefits to dependents;

(3) Making certain violations of the Act crimes, and providing penalties;

(4) Exempting 5% of employees' salaries from taxation, as well as all payments received by employees from the Fund;

(5) "There is no intimation in it that any tax funds are involved or used."

Counsel's argument addressed to this proposition reads as follows: " * * * Indeed, by peculiarly apt words, and precise grammatical marks, the idea conveyed is that it is a 'Public Employees' Retirement Fund' which is established. The use of the plural possessive case, and the juxtaposition of the words used, implies, indeed it says, that the measure does not establish a Retirement Fund for Public Employees Financed by Taxpayers, but quite the reverse. We do not wish to be understood as saying that the title should have disclosed the Act's astronomical claims upon Arizona taxpayers; no taxpayer is entitled in law to be told the cost of a statutory plan by the title or otherwise. The trouble is that 'the full and correct title' cannot be fairly said to have given notice to taxpayers that tax funds were involved. Moreover, the title on the Ballot which the taxpayer saw when he was voting, clearly avoided any implication that tax funds were involved."

and (6), "There is not the slightest indication in it that so far as concern 'Officers and Employees * * * of Political Subdivisions of the State of Arizona Including Counties, Cities, Towns and School Corporations,' that benefits to these officers and employees would depend upon whether their respective 'governing body' and the Act's board of trustees would allow the municipality by which they are employed to come under the Act, or that each such 'governing body' and the Board would have absolute and arbitrary power to put whatever employees they chose in line for the Act's benefits, or to prevent whatever employees they chose from being included as beneficiaries, or to withdraw a municipality from the Act, or to tear down existing local pension and retirement plans. * * *."

 The constitutional provision under review has been interpreted many times by this court and has been elaborately and extensively assayed beginning with the

case of Board of Control v. Buckstegge, 18 Ariz. 277, 158 P. 837, and as late and more recently In re Lewkowitz, 69 Ariz. 347, 213 P.2d 690, and Opinion on Rehearing in 70 Ariz. 325, 220 P.2d 229. By way of synopsis, these cases and those reviewed therein hold that it is not necessary that the title be a synopsis or a complete index of the legislation that is to follow; that a title is invulnerable when it is sufficiently full and comprehensive as to indicate, in a general way at least, what is to follow in the way of legislation; that it should not be so meagre as to mislead or tend to avert inquiry as to the context thereof, and it is sufficient if the provisions of the Act relate directly or indirectly to the subject expressed in the title and have a natural connection therewith and not foreign thereto; and " * * * 'the title is sufficient if it is not productive of surprise and fraud, and is not calculated to mislead the legislature or the people, but is of such character as fairly to apprise legislators, and the public in general, of the subject matter of the legislation, and of the interests that are or may be affected thereby, *and to put anyone having an interest in the subject matter on inquiry.'* " (Emphasis supplied.) 50 Am. Jur., Statutes, Sec. 167.

quoted with approval In re Lewkowitz, 70 Ariz. 325, 220 P.2d 229.

We are of the opinion that the six specifications above are without merit when measured against the constitutional provision as interpreted by the foregoing cases.

■ With reference to (1), supra, it appears to us that voluntary or compulsory retirement relates directly to the subject matter of the title.

■ (2), supra: Death benefits are expressly mentioned in the title, and certainly the matter of what dependents or nominees shall receive those benefits is properly connected with that subject.

■ (3), supra: It is the rule in this jurisdiction that Acts prescribing rights and duties, and embracing a provision making a violation thereof subject to punishment, are not objectionable and do not contravene the constitutional provision with reference to titles. State v. Davey, 27 Ariz. 254, 232 P. 884, 885.

■ (4), supra: Opposing counsel's fourth contention is that title to the Act under attack does not indicate that annuities, benefits, and contributions to the Fund shall be exempt from taxation as is provided in Section 27 of the Act. In our judgment this provision is not foreign to the subject expressed in the title. Such an exemption is commonplace in the retirement plans of other states.

■ (5), supra: Appellant's fifth contention is that there is no intimation in the title that any tax funds are involved or will be used to pay benefits. The title contains the following words: "to provide the method of financing the fund". The

provisions of the Act for employer contributions, Sections 24, 25, and 26, are directly connected with the method of financing the Fund. It is not unreasonable that these provisions appear. Common sense dictates that any retirement fund will require financing and money. The title advised that in the substance of the Act there would follow provisions providing the method of financing the Fund. This language would put upon inquiry any one having an interest in the subject matter.

And, (6) supra: The contention that the title gives no warning that the body of the Act contains provisions allowing the governing bodies of counties, cities, etc., and the board of trustees to determine "arbitrarily" whether the employees of such political subdivisions shall become beneficiaries of the Fund, or provisions prescribing how such political subdivisions may withdraw from the Fund, or provisions for including existing pension funds, is not very persuasive. The title to the Act includes the following words: "* * * to prescribe the procedures whereby political subdivisions may participate in the fund on behalf of their employees and employees of institutions, boards, commissions, officers, bureaus or any other agencies maintained by a political subdivision: to prescribe the method for inclusion of certain existing retirement and pension funds: * * * *". Thus, the title of the Act gives notice that the body of the Act will contain provisions prescribing the procedure by which the enumerated political subdivisions may participate in the system, and the procedure for the inclusion therein of certain existing retirement and pension funds. The details of those matters, of course, did not have to be set out in the title. The withdrawal provision of Section 25 likewise may be said to "relate directly or indirectly to the subject expressed in the title", and to have a natural connection therewith and not to be foreign thereto within the language of State v. Davey, supra. The title says that the Act among other things is to provide for withdrawal benefits and to prescribe the procedure whereby political subdivisions may participate in the Fund on behalf of their employees. To say that providing for participation only includes the beginning of the participation but does not include its termination is hardly logical. It seems plain that the withdrawal provisions of the Act relate quite directly to the subject expressed in the title.

These six specifications of error are hypertechnical, suggesting a narrow, strained, and uncomprehensive interpretation. Justice Ross, speaking for this court in Board of Control v. Buckstegge, supra, cogently expressed the judicial approach to this problem when he said: "The requirements of this constitutional provision are liberally construed by the courts. There is no purpose to hamper or defeat or embarrass legislation by putting a strained or technical construction

upon it. Black's Constitutional Law, 329. And if the courts entertain any reasonable doubt as to the validity of the law, they would sustain it. Under this provision, the title of an act plays a very important part. It is necessary because, without it, there can be no legislation. It may be made narrow and restricted, in which case the legislation must likewise be narrow and restricted, or it may be made broad and comprehensive, extending the legislation, providing it is germane to the subject mentioned in the title. * * *" [18 Ariz. 277, 158 P. 840]

It is contended that this Act is unconstitutional and void for the reason that the rights, benefits, duties, obligations and authority under it are prescribed in vague, indefinite, uncertain, and incomplete terms to such an extent that the Act is incapable of execution. In this behalf it is said:

(a) that it provides no intelligible means by which the sums to be paid municipalities are to be determined;

(b) that it delegates authority to the Board and to the "governing body" of each municipality, i. e., "counties, cities, towns, and school corporations" to make class legislation. Some of the argument in this behalf is that the Act empowers the county board of supervisors to pick out the "employees who are to become members of the Fund" in the first instance, and from time to time pick out an "additional group of employees to be brought under the Act." It is said that the Act does not fix any standard set of facts or principles, the existence of which determines which county employees shall be included or excluded from the Act;

(c) that it provides no means by which a municipality may raise public money to pay into the Fund;

(d) that it delegates to city councils the power to arbitrarily tear down and eliminate existing retirement plans.

■ These are only a few of the objections that are raised and argued in so far as the Act is applicable to counties, cities, towns, school districts, and existing pension systems in various political subdivisions. It is thus apparent that many legal questions are and can be raised involving the rights, benefits, duties, obligations and authority touching political subdivisions other than the State. The rights, duties and obligations of these entities or the parties who may be entitled to benefits under the Act as employees of political subdivisions other than the State are not before us and cannot, at this stage of the proceedings, be adjudicated. It is for this reason that we stated in our minute entry that we did, and we now do, expressly reserve passing upon the validity of the Act in so far as it attempts to provide for participation in the Fund by political subdivisions of the State and their employees. We cannot agree with the suggestion made that the provisions of the Act relating to municipalities and political subdivisions of

442

the State constitute such an integral part thereof as to render their retention necessary to completeness. We reached this conclusion in view of the 'Severability clause' contained in the Act, Section 28, which reads as follows: "If any section, paragraph, sentence or clause of this act is, regardless of cause, held to be invalid or unconstitutional, the remaining sections, paragraphs, sentences and clauses shall continue in full force and effect and shall be construed thereafter as being the entire provisions of this act."

Having concluded that the Act is severable in the particulars referred to, appellant, a state employee, is in no position to assert that the provisions regarding municipalities are unconstitutional. State v. Roseberry, 37 Ariz. 78, 289 P. 515; State Tax Comm. v. Board of Supervisors, 43 Ariz. 156, 29 P.2d 733; Brophy v. Powell, 58 Ariz. 543, 121 P.2d 647.

Other constitutional objections are that the Act is incomplete and incapable of execution and could not become operative (a) because its election and waiver provisions, Section 5, subd. a, could not be complied with by any state employee on the payroll prior to July 1, 1949; (b) because there can never exist a board of trustees which the Act requires, in that one of the members of the board is designated as the "state personnel officer" when in fact there is no such office in the state; and (c) because the Act does not provide authority by which the 5% deducted from the employee's salary may be transferred to the Fund. These objections, though arduously asserted, we believe are without merit, and to specifically treat each of them would unduly lengthen this opinion. Some of these provisions complained of are not patently intelligible. Some of them seem to be imperfect and will require practical administrative interpretation. Suffice it to say that in our judgment they are not so imperfect and deficient as to render impossible the execution and enforcement of the Act. The following observation, appearing in Equitable Credit & Discount Co. v. Geier, 342 Pa. 445, 21 A.2d 53, 56, is entirely appropriate: " * * * legislation dealing with social and economic problems cannot be expected, and is not constitutionally required, to be of mathematical exactitude. There are bound to be twilight zones furnishing support to critics who cavil at the want of scientific precision in the law. * * * "

The crux of this lawsuit is to be found in the determination of the soundness of appellant's Proposition of Law No. 5 when applied to this Act. The proposition is stated as follows: "An Act is unconstitutional and void when it prescribes no standards to govern the action of administrative boards and officers administering it, and delegates and surrenders unlimitative legislative powers to such administrative boards and officers to establish such standards as they please, upon which standards depend both the amounts to be paid

out in benefits under such Act and the costs of those payments to the taxpayers."

Under this proposition it is argued that the Act contains an absolute and unlimited delegation of power to the board of trustees and the actuary to fashion such "tabular standards" as they may deem fit. Our appraisal of the Act is that it does not unlawfully delegate any legislative power but that it merely authorizes the board of trustees, with the aid of their actuary, to find the necessary actuarial facts and prescribe the executive details for carrying out and giving effect to the legislation, and to enact rules and regulations for its administration, all subject to reasonably designated limitations. Section 8 of the Act provides:

" * * * The retirement benefit shall consist of:

"a. A member's annuity which shall be actuarial equivalent of the accumulated contributions of the member at the time of retirement computed according to the actuarial table in use by the fund; and

"b. An employer's annuity equal to one one-hundred-twentieth of average final compensation for each completed year of membership service, not to exceed thirty-five years, plus the sum of one hundred twenty dollars; and

"c. A prior service annuity equal to one-sixtieth of average final compensation for each year of prior service for which the member shall have been allowed credit, not to exceed thirty-five years."

Among the definitions set out in Section 4 of the Act is the following: " 'Actuarial Tables' shall mean such tabular standards as shall be adopted by the board · in accordance with recommendations of the actuary; provided that until the system has been in operation for at least three years from July 1, 1949, the combined annuity table of mortality for male lives shall be used."

In the recent case of Haggard v. Industrial Commission of Arizona, 71 Ariz. 91, 223 P.2d 915, 921, we recognized that the ordinary rule is that legislative powers cannot be delegated to administrative bodies but pointed out: " * * * this does not mean that when authorized to do so by the act itself administrative bodies may not make rules and regulations *supplementing* legislation for its complete operation and enforcement, *if such rules and regulations are within the standards set forth in the act of the legislature.*"

In this same case we further pointed out that: "Obviously, the legislature could not well fix definitely the particular rates to be used in each individual class and especially in view of the fact that these hazards change from time to time. Such fixing is peculiarly a matter for the delegation of power to an administrative body. * * * And we think the general standards above set up which fix the purpose of the insurance, the amount of the fund required,

and that in fixing the premium, the particular hazards of the risk shall be considered, create a sufficient general standard so that the rates of premium fixed thereunder by the commission are based on constitutional rules and regulations. Any other conclusion would make the operation of the act impossible."

A workable retirement Act could not well contain actuarial tables to be used for all time, but "Such fixing is peculiarly a matter for the delegation of power to an administrative body." Haggard case, supra. An overall analysis of this Act leads us to believe that it creates a sufficient general standard for the adoption of actuarial tables by the board, based upon the experience of the Fund subsequent to the first three years of operation. During this first three-year period the particular annuity table to be used is designated. Section 4, Definitions. It must be remembered that the people, in enacting this law, had an objective in mind and, as we are constrained to believe, provided sufficient standards and overall limitations to meet practicable and reasonable constitutional mandates. To make this type of legislation effective will require many rules and regulations, which practicable suggestions cannot be particularly or exactly set forth without destroying the flexibility necessary to effectuate the legislative will. It has been said that "If wide power in an administrative body is imperative, the rule requiring definite standards and rules of guidance will be somewhat relaxed." 16 C. J.S., Constitutional Law, § 138. See Duncan v. A. R. Krull Co., 57 Ariz. 472, 114 P.2d 888; Employment Security Comm. v. Arizona Citrus Growers, 61 Ariz. 96, 144 P.2d 682. In any event, during the first three years of the operation of the Fund, the Combined Actuary Table of Mortality for male lives shall be used in computing the benefits provided for in Section 8 of the Act. At the end of the three-year period it appears to us that a fair interpretation of the Act suggests that the actuarial tables to be used thereafter will be based upon the experience of the Fund. This conclusion is reached by having reference to subdivisions (c), (d) and (h) of Section 17. Subdivision (c) in part provides: "The board * * * shall * * * adopt all necessary actuarial tables to be used in the operation of the system as prepared by the actuary, and compile such additional data as may be necessary for required actuarial valuations *and actuarial studies of the operating experience of the fund.*" (Emphasis supplied.)

Sections 18 and 24, together with other provisions of the Act, are demonstrative of the concept that it is the experience of the Fund that will suggest and control the actuarial tables to be used. The choice of such "tabular standards", purely an exercise of administrative discretion, is properly left to those deemed qualified to make such choice, namely, the board of trustees with the aid of their technical adviser, the actuary.

Appellant admits that the standard provided in the definition of "regular interest" in Section 4 of the Act (having importance in connection with the definition of "accumulated contributions") to wit: "based upon the actual experience of the Fund" is ample and a sufficient legal yardstick. The very same yardstick governs the choice of "actuarial tables" by the board. Any other conclusion runs counter to ordinary common sense.

When counsel object to the definition of "regular interest" the answer is that a decision thereon is a matter of administrative discretion and is properly left to the board. The Act prescribes the rate of regular interest to be 3% per annum *unless* the actual experience of the Fund shows the earning of a different rate, in which case *that rate* is the lawful rate. The board simply finds the "objective" fact, i. e., what is the interest rate as determined by the actual experience of the Fund? If such actual experience shows any other rate than 3% per annum then *that* rate shall be prescribed by the board.

The Act very definitely enumerates the benefits to be provided and for a given number of persons, namely, those who are members of the Fund. With this data and the other factors to be considered, such as age of employee, length of service, salaries earned, contributions made, no difficulty will be entailed in figuring the exact amount of benefits to be paid to any person entitled.

To meet the challenge of counsel that the Act is incomplete and incapable of execution because the amount to be paid to an employee on retirement is uncertain, vague and indefinite, we are impelled to attempt to apply the provisions of the Act to a suppositious case. What would the retirement pay be for a member sixty-five years of age as of December 31, 1950 who had been a member of the Fund since July 1, 1949, with the following assumptions?

Assuming salary from 7–1–22 to 6–30–32 10 years at $2700.00
 7–1–32 to 6–30–42– 10 " " 3300.00
 7–1–42 to 12–31–50 8½ " " 3600.00
 Contributions withheld from 7–1–1949 to 12–31–1950
 $270.00. (5% of salary) Sec. 23.
(a) Monthly pension, assuming retirement at age 65—
 1. Past service 27 years; 7–1–1922 to 7–1–1949—
 One-sixtieth times $3600 times 27 years equals $1620, or $135
 per month—Sec. 8(c).
 2. Current service—paid by the employer—
 (a) Equals one and a half times one one-hundred-twentieth times
 $3600 equals $45 per annum or $3.75 per month. Sec. 8 (b).
 (b) Additional current service—annuity equals $10 per month.
 Sec. 8 (b).

3. Employee's annuity equals $1.65 per month. Sec. 8 (a).

Total pension is $150.40.

Value of the pension provided by the *employer*, (State of Arizona), calculated by the Combined Annuity Mortality Table for males at 2½% [1] interest equals $*18,585.00*.

Value of the pension provided by the *employee* is $*270.00*.

Combined reserve by the employee and employer is $18,855.00.

The employee would not have to put up any more money by way of contributions but the State would have to contribute such sum or sums which, together with interest, would provide a pension chargeable to it of the value of $18,585.00. To place the Fund upon a sound actuarily funded basis would require the State to presently make its contributions for the reserve (on account of past services) of this suppositious employee, since *no reserves have been* set up out of which to pay the pension now due. The State, in addition to its current contributions, will have to make sufficient contributions to provide for the value of all pensions chargeable to it, based on past creditable services prior to the effective date of the Act.

■ Counsel for appellant contend, and not without a degree of merit, that Section 24 of the Act appears to require complete initial funding " * * * covering all service of the employees including service prior *to the effective date and service sub*sequent thereto, * * *." The Act is silent as to how or when reserves are to be provided for past services. It is for this reason that counsel for appellant has estimated that the State will be required to initially contribute a sum in excess of eight million dollars ($8,000,000), which does not include sums which would be required for Death, Ordinary Disability, Accidental Disability, and Accidental Death benefits, and for cost of administering the Act, all of which are to be paid one hundred per cent from tax funds. Much argument is addressed to these cost features, which are asserted to be stupendous, beyond the ability of the State to pay, and assuredly not encompassed within the understanding of the voters at the time the Act was enacted.[2] (See footnote) Presumably those voters not voting did not understand the provisions and full import of the Act. Whether those voting for the Act understood it is subject to conjecture and speculation. Questions of economic and social policy

---

1. Interest was calculated at the rate of 2½% in view of the representations made to us that no greater return could be expected at this time from the type of securities available to the Board under Section 21.

2. Number of registered voters, 240,998; total ballots cast, 184,323; voting for the measure, 86,989; voting against the measure, 38,111. 59,223 voters did not vote one way or the other.

are properly addressed to the lawmaking branch of the government, in this instance, the people. That the people may have assumed a financial obligation beyond their reach constitutes no basis for a constitutional attack.

For the reasons stated, the judgment is affirmed subject to the reservations herein expressly contained.

UDALL, C. J., and STANFORD and DE CONCINI, JJ., concur.

PHELPS, Justice (dissenting).

I regret that I am unable to concur with the majority opinion in this case. I quite agree with the majority that a number of questions have been presented and argued that are without merit. But I am convinced that there are at least two points raised to the unlawful delegation of legislative power that are sound.

First, section 17, subd. c of the Act provides that the board of trustees shall have among others, the following duties: "* * * adopt all necessary actuarial tables to be used in the operation of the system as prepared by the actuary, and compile such additional data as may be necessary for required actuarial valuations and actuarial studies of the operating experience of the fund."

If this language is literally construed the board is not authorized to exercise any discretion in the matter of adopting actuarial tables but must adopt without question, such necessary tables as may be prepared and recommended by the actuary regardless of their actuarial soundness. I find the cardinal difficulty however to be that this legislation has delegated to the actuary authority to prepare and recommend the promulgation of such tables as he may choose without setting up any standards by which he is to be guided in preparing such tables or upon which their accuracy can be ascertained.

I confess I am not familiar with actuarial tables or with the factors considered in their preparation but my limited experience and observation relating to kindred matters suggest to me that at least, among the things to be considered by an actuary would be the number of employees participating in the Fund, their ages, their length of service, their wages, their sex, their classification as to the work they perform and the hazards involved therein, perhaps their state of health, the contributions required of them and the annuities and benefits provided for in the Act. I assume the actuary in preparing such actuarial tables must apply those factors and whatever others are involved to some established recognized formula upon which the table must rest. The same limited experience and observation suggests to me that these retirement measures and other like legislation requiring the use of actuarial tables, as well as those used by insurance companies, have been in operation sufficiently long to

have developed formulas recognized as standard upon and by which computation may be made in the preparation of actuarial tables and when applied the same factual circumstances will always produce the same results.

If I am correct in this observation then the Act under consideration should have required the actuary to use one of these standardized tables in computing the amount to be contributed by the state, leaving to the actuary only the authority to apply the facts and circumstances found to exist in this particular case to that table and make his computations accordingly. The problem would then be reduced to one of mathematics and properly within the delegative power of legislative bodies. If the actuarial table is based upon either of the Experience Mortality Tables and is arrived at by applying the factual situation found to exist with reference to employees affected under the Act, then the same Experience Mortality Table should have been designated as a permanent standard for the preparation of such actuarial tables.

An examination of different mortality, annuity and interest tables including the American Experience of Mortality, The Actuaries' Combined Experience Table of Mortality and Dr. Wigglesworth's Table of Mortality indicate, for example, a considerable variation in the present value of a dollar at the same rate of interest based on the same age and life expectancy. To be more concrete according to the Combined Experience Table of Mortality the present annuity value of a dollar based on interest at 5% at the age of 41 is $13.252. Dr. Wigglesworth's table of mortality shows the present annuity value of a dollar at the same rate of interest and at the same age to be $12.53. Evidently a varying disparity would arise regardless of the rate of interest. This one factor alone would make considerable difference in computing annuities. It is logical to infer that other results would vary in the application of other factors to be considered.

By leaving the board of trustees and the actuary free to adopt whatever actuarial tables they deem proper without designating any standards by which they are to be determined, the Act delegates to the actuary and the board the power to make a law whereas the limit of the legislative power is to delegate to them the authority to determine facts or some set of facts upon which the action of the law is intended to depend. Therefore I cannot escape the conviction that the carte blanche authority given to the actuary and to the board of trustees to adopt actuarial tables without setting up recognized standards for their guidance constitutes an unlawful delegation of legislative power rendering the Act null and void. Duhame v. State Tax Commission, 65 Ariz. 268, 179 P.2d 252, 171 A.L.R. 684; Panama Refining Co. v. Ryan, 293 U. S. 388-448, 55 S.Ct. 241, 79 L.Ed. 446.

The contributions of the state, counties, cities, towns and school districts are likewise ascertained by the actuary and determined by the board of trustees by the use of whatever actuarial table or tables the actuary chooses to recommend to the board. When such amount is fixed by the board of trustees it becomes mandatory upon the state, county or municipality to levy a tax to meet the obligation regardless of the condition of its budget.

There is no limitation in the Act upon the amount of taxes required to be levied by counties and participating municipalities. Under the present law counties and municipalities of Arizona may not increase their taxes to exceed 10% above the amount levied the preceding year. If this Act is held to be constitutional it repeals by implication the law prohibiting the increase of taxes levied by counties and cities in excess of 10% above the amount levied the previous year. The amount necessary to meet the requirements of the Act may in itself be far in excess of the 10% differential fixed by the provisions of Chapter 73, Article 4, A.C.A.1939. It amounts to a levying of a tax without according to the taxpayer an opportunity to be heard and which denies to him due process of law. For that reason the Act must fall. State Tax Commission v. Shattuck, 44 Ariz. 379, 38 P.2d 631.

The Indiana Act after which the Retirement Act was evidently largely patterned provides in section 22 thereof as follows:

"It is further provided that a municipality, as herein defined, (the same as ours) electing to become a participant in the fund, is hereby authorized and empowered to increase its annual tax levy, above the limitation now or hereafter imposed by law, to meet the cost of participation in the fund herein created. This increase shall be limited to a rate on each dollar of taxable property assessed for taxation in such municipality which will produce an amount not in excess of fifteen (15) per cent of the annual average of total salaries of the employees of said municipality or participating unit * * *." Burns' Ann.St. § 60-1622.

An inclusion of this provision in the Arizona Act would have cured the latter defect pointed out.

Let us next examine section 22 of our Act providing that:

"Any municipality may elect, by ordinance or resolution adopted by the governing body as defined herein to become a participant in the fund established by this act.

"A copy of any such ordinance or resolution, duly certified, electing to join the fund and to make the required contributions thereto under the provisions of this act, shall be filed with the board of trustees of the Public Employees' Retirement Fund of Arizona. Such ordinance or resolution shall designate by departmental, divisional, occupational or other definable classification, the employees who are to become

members of the fund. Membership in the fund of any municipality or any group of employees thereof shall be subject to the acceptance and approval of the board of trustees of the Public Employees' Retirement Fund of Arizona. * * *"

It is my view that the portion of the section just quoted is clearly an unlawful delegation of legislative authority. I am thoroughly familiar with the rule that boards of supervisors and municipal council occupy a position different from that of the ordinary administrative board. It is held by all of the authorities that boards of supervisors and city council have power to enact ordinances when that power has been expressly or by necessary implication granted to them by the legislature. Associated Dairy Products Co. v. Page, 68 Ariz. 393, 206 P.2d 1041. No such right, however, is enjoyed by purely administrative boards such as the board of trustees created by the provisions of this Act and boards of trustees of school districts. I do not think there is any doubt that the legislature or the people could lawfully delegate to boards of supervisors and to the legislative bodies of cities and towns the authority to pass an ordinance or resolution electing to participate in the Retirement Fund created by this Act but when the Act went further and authorized these governing bodies to designate which department, division, occupation or other definable classification may become members of the Fund to the exclusion of others without setting up some standard by which such designations were to be made, as by common consent of the members of the department or by a majority thereof, such provision constituted an unlawful delegation of power to them. It delegated to these bodies the power to classify employees of counties and cities. The power to make such classifications when reasonable, resides in the legislative body alone and cannot be delegated.

Neither the legislature nor the people, however, could pass a retirement act, for example, covering all state employees and extend it only to the employees in the assessor's or recorder's office of the various counties. This is true for the simple reason that the selection of the employees of either or both of these departments to the exclusion of others would constitute an unlawful classification of employees to whom the bounty under the provisions of the Act may be available.

The power of the legislature to classify groups who may or may not participate in the benefits of an act of legislation is too well settled to require citation of authority to sustain it but it is equally well settled that such classification must be reasonable. It " 'must embrace all and exclude none whose conditions and wants render such legislation equally necessary or appropriate to them as a class.' " Hunt v. Mohave County, 18 Ariz. 480, 162 P. 600, 602. "The classification * * * must rest upon some ground of difference having a fair and substantial relation to the object of the

legislation, so that all persons similarly circumstanced shall be treated alike." Colgate v. Harvey, 296 U.S. 404, 56 S.Ct. 252, 256, 80 L.Ed. 299. To designate the employees of the assessor's office as beneficiaries and deny it to the employees of the recorder's office or the treasurer's office is an unreasonable classification and would be wholly void for that reason. Certainly if the department of government or the people in whom the power of legislation resides may not thus arbitrarily classify employees who are to participate in the Fund it cannot delegate such authority to any one else. I therefore hold that the attempt to do so in the above provisions of the Act is unconstitutional and void.

I think there cannot be the slightest doubt that to delegate to the board of trustees the power to arbitrarily reject the employees of any municipality or of any department thereof after their election to participate in the Fund according to the provisions of the Act constitutes an unlawful delegation of legislative authority to such board and is therefore wholly void. This is too patent to require citation of authority. It will be observed that in this provision as in the others above mentioned there is lacking any semblance of a standard by which the act of the board of trustees may be measured. It grants to the board the attributes of despotism. True the board may never exercise its power. It is not what the board may or may not do in that respect with which we are concerned. It is what it has the power to do that is important. Hernandez v. Frohmiller, 68 Ariz. 242, 204 P.2d 854.

Extraordinary conditions do not create or enlarge constitutional power. The fact that it may have been more difficult to set up standards for the guidance of the actuary, the trustees of the Fund and the governing bodies of municipalities, as defined in the Act, cannot justify its omission. Brown v. Illinois Bankers Life Assur. Co., 144 Kan. 670, 63 P.2d 165. A standard cannot be set up which is so indefinite as to confer unlimited power. State ex rel. Donaldson v. Hines, 163 Kan. 300, 182 P.2d 865; Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166.

It is a well-recognized rule of statutory construction that if a severable portion of a statute is declared to be unconstitutional it does not affect the validity of the other portions of the statute. There is an exception to this rule, however, which is equally as well established as the rule itself to the effect that if the invalid portion was a consideration and an inducement to the enactment of the whole act and it may be presumed that the law would not have been enacted had the invalid portion been omitted, then the whole act must fall. Alabam's Freight Co. v. Hunt, 29 Ariz. 419, 242 P. 658.

I believe it to be an indisputable fact that the success of an initiative measure at the

polls depends upon the efforts of those who are to benefit directly or indirectly by it and without such support it has little chance of carrying. The court will take judicial notice of the number of votes cast for and against the Act under consideration throughout the state. After a study of those returns I am of the view that the majority it received in counties where state employees were comparatively few in number raises a strong presumption that the measure received the support of the county and municipal employees in that area and would not have carried at the polls had the invalid portion thereof relating to counties, municipalities and school districts been omitted. I am further of the view that its inclusion in the Act was a most potent consideration and inducement to its passage. I therefore am constrained to hold that the whole Act is void for the reason last above stated.

A cardinal rule of statutory construction is that the court must determine, if possible, the legislative intent and that such intent must be found in the language of the statute aided by canons and rules of construction. Barlow v. Jones, 37 Ariz. 396, 294 P. 1106. An act passed by the legislature is presumed to have been carefully studied by the members before voting for or against its passage. This is true because it is presumed that a public official will discharge the duties of his office to the best of his ability as required by his oath of office. If he complies with that oath he thoroughly familiarizes himself with all legislation introduced for passage and any law for which he votes should therefore represent his legislative intent, since intent can only be made manifest through the use of appropriate language designed to express such intent.

If the courts are realistic can they presume that the voters who support an initiative measure have studied it or even read it? To so presume amounts to the creation of a legal fiction upon which to base a finding of legislative intent; a legal fiction I believe to be completely refuted by the facts. I recognize that the Constitution reserves to the people of the state the right to initiate and pass legislation of this kind and it may be that, upon the ground of public policy, it is entitled to be shielded by the same protective armor of legal presumptions that surround an act of the legislature. Public policy, however, is the only theory in my opinion upon which such presumption could possibly rest. I say this for the reason that it is common knowledge that voters, for the most part, have no knowledge whatever of the contents of initiative measures, therefore the language used therein cannot be said to express their legislative intent. Under such circumstances it is very doubtful in my mind if public policy should be allowed to prevail in establishing a legislative intent in initiative measures when the facts all contradict that presumption.

I have devoted approximately three weeks to the study of this Act and do not now presume to know in detail what it means. Many of the terms used are technical, portions are vague and incapable of understanding. I haven't the slightest idea of how to compute annuity benefits provided for under section 8 of the Act, nor can I comprehend how contributions of the state for death and disability benefits and for expenses of administration can be based upon the "experience of the Fund" until there is an "experience of the Fund." Without such "experience of the Fund" there exists nothing upon which the legislature can ascertain what the amount of the appropriation for this purpose should be, and incidentally it will necessarily amount to a considerable sum. Initiative legislation is at best a dangerous, and may prove to be, a most expensive experiment. If the illustration of the practical operation of the Act outlined in the majority opinion is correct, let us see where it leads us: The suppositious employee there has been employed since 1922 drawing $2,700 salary for the first ten years; $3,300 the second 10 years, and $3,600 from 1942 to the date of his retirement, December 31, 1950. He is then 65 years of age and has paid into the Fund $270. Let us assume, without any attempt at accuracy, that the present value of $18,585 is three-fourths of its value approximately 10 years hence or $14,000. This certainly is far less than its actual present value would be under actuarial computation. The state of Arizona on that basis would contribute $52 to the Fund for every $1 contributed by the employee. That amount would have to be contributed forthwith for investment at a 2½% rate of interest in order to keep the Fund solvent. If the ratio of contributions by the state and by employees approximate this figure in its application to all employees, it brings into vision a red light indicating danger ahead.

However I use the illustration to point out how improbable and impossible it would be for a voter to understand its contents or its effect and how absurd it would be to presume the same legislative intent in an act passed by a vote of the people as that to which an act of the legislature is entitled. As pointed out in the majority opinion courts may not concern themselves with the wisdom of any legislation whether passed by the legislature or by the people. Their province is to interpret the law as they find it.

There is yet another outstanding omission in the Act which standing alone would not be serious. But with the unparalleled power attempted to be delegated to the actuary and to the board of trustees without standards by which, and limitations within which, they must function it becomes vitally important. No provision appears in the Act for an appeal to the courts for the redress of wrongs which may be committed by either the actuary or the board of trustees in the course of administration of the

454

Fund. I realize that ordinarily such omission does not prevent resort to the courts by way of mandamus, prohibition or certiorari where discretion has been abused or jurisdiction exceeded by agencies given the power to administer or to participate in the administration of the Act. I point out however that in the Act under consideration no standards or guide posts have been erected within the limits of which they are required to act. Neither discretion nor jurisdiction are circumscribed by the terms of the Act. Therefore if such litigation should arise the court would be without compass or lighthouse to direct its course. If the Act itself sets up no boundaries within which the administration of the Act must be restricted then the court has nothing to take hold of by which it can say that the Act is or is not being properly administered. It has nothing by which it can say that discretion is being abused or that jurisdiction is being exceeded. No one would undertake to assert that the court sui juris may set up such standards by which it can say there has been an abuse of discretion, or jurisdiction exceeded where by the provisions of the Act no limitation upon the power of the board of trustees or the actuary has been fixed.

There can be no doubt but that a just, intelligible and constitutional retirement act for public employees in this state would redound to the benefit of both the state and its employees and that such a law is urgently needed. But it is my considered judgment that the Act under consideration meets neither of these requirements.

For the reasons set forth in this opinion I hold the Act to be unconstitutional and that the judgment of the lower court should be reversed.