SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| CLEAN ELECTIONS INSTITUTE, INC., an Arizona non-profit corporation; MICHAEL J. VALDER; and LYDIA GUZMAN, | Arizona Supreme Court No. CV-04-0263-AP/EL |
| Plaintiffs/Appellees/ Cross-Appellants, v. | Maricopa County Superior Court No. CV2004-012699 |
| JANICE BREWER, in her official capacity as Secretary of State for the State of Arizona, | |
| Defendant/Appellant/ Cross-Appellee, | |
| NO TAXPAYER MONEY FOR POLITICIANS, an unincorporated association; ERIC CROWN, in his capacity as chairman of the association; LETTIE PHILLIPS, in her capacity as treasurer of the association, | **O P I N I O N** |
| Real Parties in Interest/ Appellants/Cross-Appellees. | |

Appeal from Superior Court of Maricopa County
CV-2004-012699
The Honorable Margaret H. Downie
**AFFIRMED**

_____

Perkins Coie Brown & Bain P.A.                                    Phoenix
     by   Charles A. Blanchard
          Michael S. Mandell
          Michael T. Liburdi

Attorneys for Clean Elections Institute Inc., Michael J. Valder and Lydia Guzman

James P. Walsh, Acting Attorney General                    Phoenix
    by  Jessica G. Funkhouser, Special Counsel
        Diana L. Varela, Assistant Attorney General
Attorneys for Janice Brewer

Gammage & Burnham                                          Phoenix
    by  Lisa T. Hauser
        Cameron C. Artigue
Attorneys for No Taxpayer Money For Politicians, Eric Crown and
Lettie Phillips

Coppersmith Gordon Schermer Owens & Nelson P.L.C.          Phoenix
    By   Andrew S. Gordon
Attorneys for Amicus Curiae Arizona Corporation
Commissioners/Candidates for the Arizona Corporation
Commission

Irvine Law Firm, P.A.                                      Phoenix
    by   Thomas K. Irvine
Attorneys for Amicus Curiae Hon. Raul H. Castro
_____

M c G R E G O R, Vice Chief Justice

¶1        In November 1998, the voters of Arizona adopted the Citizens Clean Elections Act (the Act), later codified as Arizona Revised Statutes (A.R.S.) §§ 16-940 to 16-961 (Supp. 2003).  In June 2004, a group known as No Taxpayer Money for Politicians filed initiative petition signature sheets seeking to qualify Proposition 106 for the 2004 general election ballot. The plaintiffs brought this action to enjoin the Secretary of State from certifying Proposition 106.  Following a hearing, the superior court concluded that Proposition 106 violated the

"separate amendment rule"[1] of Article 21, Section 1, of the Arizona Constitution because it incorporates two separate constitutional amendments.  For that reason, the court ordered that the matter not be certified and placed on the ballot.  On August 12, 2004, we entered an order affirming the judgment of the superior court, with this opinion to follow.

**II.**

¶2      Whether an initiative violates the separate amendment rule presents a question of law, which we review *de novo*.  *See Hohokam Irrigation & Drainage Dist. v. Ariz. Pub. Serv. Co.*, 204 Ariz. 394, 397 ¶ 5, 64 P.3d 836, 839 (2003).

**A.**

¶3      The Arizona Constitution includes two provisions often loosely referred to as adopting a "single subject rule." The first, Article 4, Part 2, Section 13, sets out the rule that applies uniquely to statutes enacted by the legislature.[2]  That provision states:

> Every Act shall embrace but one subject and
> matters properly connected therewith, which
> subject shall be expressed in the title; but
> if any subject shall be embraced in an Act

---

[1]     Although this Court has referred to Article 21 as setting out a "single subject rule," its language can better be described as setting out a "separate amendment rule," and we will use that term in this opinion.

[2]     Article 4 does not apply to laws adopted by initiative. *Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516, 524 ¶ 35, 1 P.3d 706, 714 (2000).

3

> which shall not be expressed in the title,
> such Act shall be void only as to so much
> thereof as shall not be embraced in the
> title.

Ariz. Const. art. 4, pt. 2, § 13.

**¶4**    The purpose of this single subject provision is to prevent surprise and the evils of surreptitious or hodgepodge legislation, including the practice known as logrolling. *Taylor v. Frohmiller*, 52 Ariz. 211, 215-16, 79 P.2d 961, 963 (1938). Although this provision does not require that the "title of the act should be a complete index to the legislation contained therein," *id.* at 216, the title of an act "should not be so meager as to mislead or tend to avert inquiry as to the context thereof . . . ." *Dennis v. Jordan*, 71 Ariz. 430, 439, 229 P.2d 692, 697-98 (1951).  To allow the legislature freedom to act, while enforcing the command of this provision, our interpretation of the single subject rule must be not "so narrowly technical on the one side so as to substitute the letter for the spirit, or so foolishly liberal on the other as to render the constitutional provision nugatory . . . ." *Taylor,* 52 Ariz. at 217, 79 P.2d at 964.  Under this provision, we construe legislation liberally in favor of its constitutionality. *See White v. Kaibab Rd. Improvement Dist.*, 113 Ariz. 209, 212, 550 P.2d 80, 83 (1976).

¶5 The constitutional language also directs that "if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be embraced in the title." Ariz. Const. art. 4, pt. 2, § 13. Thus, if one portion of a statute violates the single subject rule, "only that part which is objectionable will be eliminated and the balance left intact."[3] *State v. Coursey*, 71 Ariz. 227, 236, 225 P.2d 713, 719 (1951); *see also Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516, 522, 1 P.3d 706, 712 (2000) (stating that unconstitutional provision of act was severable from remainder of act).[4]

**B.**

¶6 In contrast, the Arizona Constitution establishes a stricter test for determining whether a proposal involves more than one constitutional amendment. *See* Ariz. Const. art. 21, §

---

[3] To determine whether the court can sever the offending portion of a statute, we consider "whether the valid portion can operate without the unconstitutional provision and, if so, we will uphold it unless the result is so absurd or irrational that one would not have been adopted without the other." *Citizens Clean Elections Comm'n*, 196 Ariz. at 522, 1 P.3d at 712.

[4] The saving measure of severance responded to the concern, as expressed by some framers of the Arizona Constitution, that the single-subject provision established "a handle or a string upon every law by which the court can declare it unconstitutional." Statement of Fred L. Ingraham (Nov. 23, 1910), in *The Records of the Arizona Constitutional Convention of 1910*, at 590 (John S. Goff ed.).

(Article 21).  In language distinguishable from that used to describe the single-subject rule, the constitution provides:

> If more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately.

Ariz. Const. art. 21, § 1.

¶7      The clear import of this provision is that voters must be allowed to express their separate opinion as to each proposed constitutional amendment.   The separate amendment rule of Article 21 differs from the single-subject rule of Article 4 in two important respects.   First, although statutes comply with the single-subject rule if they "embrace but one subject *and matters properly connected therewith*,"  Article 21 includes no reference to matters "connected with" a proposed constitutional amendment.   Simply showing that several sections of a proposed amendment relate to the same general subject as that expressed in the title of the proposed amendment does not satisfy the requirements of Article 21.   Instead, Article 21 requires that each proposed amendment "shall be" presented in a manner that allows the voters to consider and vote for or against each amendment separately.

¶8      Second, unlike the single-subject provision of Article 4, Article 21 does not permit the court to sever an offending provision from a multiple-proposal constitutional amendment.  *See*

6

*Taxpayers Prot. Alliance v. Arizonans Against Unfair Tax Schemes*, 199 Ariz. 180, 182 ¶ 7, 16 P.3d 207, 209 (2001) (holding that court has no authority to sever sections of a proposed amendment to the constitution). Instead, if a proposal includes more than one amendment, the entire proposal falls within the constitutional prohibition.

¶9 The distinctions between Article 4 and Article 21 reflect the unique position and importance of the Arizona Constitution in state governance. The constitution provides a statement of basic principles that inform and define the foundation of the state's laws. *See Miller v. Heller*, 68 Ariz. 352, 357, 206 P.2d 569, 573 (1949) ("The constitution of this state, second only to the constitution of the United States, is the supreme law of Arizona."); *see also Cecil v. Gila County*, 71 Ariz. 320, 322, 227 P.2d 217, 218 (1951) (stating that the Arizona Constitution is basic law); *see also* John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 112 (Spring 1988) ("[O]ne thing about the intent of the framers of the Arizona Constitution is absolutely clear - they fully expected the document they crafted to be the primary charter of state government and the primary check on it."). If the principles set out in this fundamental document are to be changed by a vote of the people, the voters must receive the

opportunity to express their opinion clearly as to *each* proposed change.

¶10     When a proposed amendment consists of multiple provisions, the proposal constitutes one amendment under the terms of the constitution only if its provisions "are sufficiently related to a *common purpose or principle* that the proposal can be said to constitute a consistent and workable whole on the general topic embraced, that, logically speaking, should stand or fall as a whole." *Kerby v. Luhrs*, 44 Ariz. 208, 221, 36 P.2d 549, 554 (1934) (emphasis added).

¶11     Under the "common purpose or principle test,"

> [i]f any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition.

*Id.*

¶12     To determine whether the provisions of a proposed amendment meet the common purpose or principle test, we consider objective factors such as

> whether various provisions are facially related; whether all the matters addressed by an initiative concern a single section of the constitution; whether the voters or the legislature historically has treated the matters addressed as one subject; and whether the various provisions are qualitatively similar in their effect on either procedural or substantive law.

*Korte v. Bayless*, 199 Ariz. 173, 177 ¶ 11, 16 P.3d 200, 204 (2001) (citations omitted).

## III.

## A.

¶13     To measure Proposition 106 against the dictate of Article 21, we first describe briefly the Clean Elections Act, which Proposition 106 is intended to affect.  The Act established the Citizens Clean Election Commission (the Commission).  A.R.S. § 16-955.  The Act assigns the Commission many duties related to the conduct of public elections, but three are paramount.  First, the Commission administers the public funding provided under the Act for the campaigns of participating candidates.  *Id.* § 16-951.  Second, it administers a voter education program and provides for debates among candidates.[5]    *Id*. § 16-956.A.1 and A.2.  Third, the Commission enforces the provisions of Title 19, Chapter 6, Article 2,

---

[5]    According to the record in this case, the Commission will spend $1,258,541.25 in 2004 to publish and distribute voter guides.    In 2002, the last complete election cycle, the Commission spent $1,601,437 for voter education. *See 2002 Annual Report of the Clean Elections Commission*, at 34, available at http://www.ccec.state.az.us/ccecscr/pub/pdfPub.asp?docName=2002%20Annual%20Report&docFile=ccec_ar2002.pdf.

dealing with administration and enforcement.[6]  *Id.* § 16-956.A.7. The latter two categories do not relate to the public financing of political campaigns.  Rather, they address voter education and require that the Commission enforce measures such as (1) statutory limits on acceptance of campaign contributions, which limits apply to candidates not receiving public funding, § 16-941.B.1, (2) requirements concerning reporting of contributions by candidates who do not receive public funding, § 16-941.B.2, (3) requirements that those making independent expenditures file periodic reports, § 16-941.D, and (4) provisions allowing candidates to agree jointly to restrict campaign expenditures, § 19-941.C.1.  Nothing in Proposition 106 alters these statutory duties.  The Commission, therefore, would retain full enforcement authority and responsibility as to these provisions even if the voters abolished public financing of political campaigns.

¶14     Under the Act, campaign funding for participating candidates, as well as funding for the Commission to carry out its various duties, comes not from the general fund, but rather from the Clean Elections Fund (the Fund), which receives monies from a variety of explicitly dedicated sources.  Any taxpayer may contribute five dollars to the Fund by marking an optional

---

[6]     In 2002, the Commission spent $845,141 on administration and enforcement. *See 2002 Annual Report* at 34.

check-off box on his or her Arizona income tax form.  Taxpayers who do so receive an equal tax credit.[7]  *Id.* § 16-954.A. Taxpayers also may donate taxes owed the state to the Fund, in an amount up to twenty percent of the tax owed, or five hundred dollars per taxpayer, whichever is higher.[8]  *Id.* § 16-954.B. Finally, the Act imposes a surcharge of ten percent on all criminal and civil fines and penalties, the proceeds of which are deposited into the Fund.[9]  *Id.* § 16-954.C.

¶15    The Act also places limits on monies that the Commission may spend and defines the expenditures that the Commission must or may make.  The Act caps the total amount the Commission may spend each year at five dollars for each state personal income tax return filed by an Arizona resident during the previous calendar year.  *Id.* § 16-949.A.  The Commission "may use" up to ten percent of this amount for administrative and regulatory expenses.  *Id.* § 16-949.B.  Any portion of the ten percent not used for these purposes remains in the Fund. *Id.*  The Act also instructs that the Commission "shall apply"

---

[7]    In 2002, the Commission received $3,254,258 from such check-offs.  *See 2002 Annual Report* at 32.

[8]    In 2002, the Commission received $98,688 from such donations.  *See 2002 Annual Report* at 32.

[9]    In 2002, the Commission received $6,252,944 in fines, forfeitures and penalties.  *See 2002 Annual Report* at 32.

11

ten percent of the money collected pursuant to section 16-949.A to voter education. *Id.* § 16-949.C.

¶16     At least once each year, the Commission must project the amount of money it will collect over the next four years. *Id.* § 16-954.D. Then, assuming it will spend the maximum amount allowed by section 16-949.A, the Commission designates any projected surplus as excess funds, which return to the state's general fund. *Id.* § 16-954.D.

**B.**

¶17     We apply the common purpose or principle test of *Korte* and *Kerby* to the operative sections of Proposition 106. If we cannot conclude that the provisions should stand or fall together or that a voter supporting one would reasonably be expected to support the principle of the other, we are obliged to find that Proposition 106 violates the separate amendment rule of Article 21.

¶18     Section A of Proposition 106 states that "[n]o taxpayer money[10] shall be used to fund any political candidate or

---

[10]     Section B of Proposition 106 broadly defines "taxpayer money" as "any tax, fee, assessment, surcharge, forfeiture, penalty, fine, other revenue or funds collected by the state, a political subdivision, department, agency or instrumentality of the state, city or town" or "any contribution, donation or expenditure that is eligible for a state tax reduction, deduction, exemption, exclusion, credit, donation, check-off or other tax feature." The definition effectively includes all money currently used to fund the Commission, regardless whether it comes from taxpayers.

campaign for statewide office or the office of a member of the legislature." The purpose underlying section A seems clear: this provision seeks to end public funding of statewide and legislative campaigns. The section uses clear and sufficient language to accomplish its purpose: If the voters were to adopt this language, the Arizona Constitution would forbid public funding of campaigns, and those portions of the Clean Elections Act that require such funding would violate the Constitution and, hence, be unenforceable. Voters who agree with the principle that Arizona should not provide public funding for campaigns presumably would support this provision.

¶19    Section C of Proposition 106 provides that "all money in [the Clean Elections Fund], on and after the effective date of this section, shall be deposited in the general fund of the state." This language dramatically changes the funding source for the Clean Elections Commission by sweeping funds dedicated by the voters to the Commission into the state's general fund. Under the Act as adopted in 1998, and subject only to its limitations, the Commission independently decides how to spend the monies in the Fund and how much to spend on particular activities. *See* ¶ 15, *supra*. By virtue of section C of Proposition 106, the Commission, rather than being funded from an established, dedicated source, will become dependent upon legislative appropriations from the general fund to support all

13

Commission duties unrelated to public campaign financing. In short, section C strips the Commission of its independence from legislative appropriation and renders it subject to legislative control of its budgeting decisions.

¶20      No facial relationship exists between sections A and C, and the sections advance no common purpose or principle. The purpose of section C, unlike that of section A, cannot be to eliminate public funding of political campaigns: Section A accomplishes that purpose. Nor can the purpose of section C be simply to assure that dollars no longer used for public funding of political campaigns be returned to the general fund. Section 16-954.D of the Act as it presently exists already requires the periodic return of excess funds to the general fund and, in addition, the impact of section C is not limited to funds that previously might have been used for political campaigns. Rather, section C reverts the entirety of all monies deposited in the Fund to the general fund.

¶21      One purpose of section C must be to deprive the Commission of its authority to make independent budgeting decisions by changing the funding source for the Commission and, concomitantly, to increase the amount of monies that go into the general fund.[11]  Therefore, no common purpose joins sections A

---

[11]    The initiative description prepared by the proponents of Proposition 106 suggests that increasing the general fund is at

14

and C. Nor can we conceive of a common principle that underlies the two provisions. The question posed by section C, whether Arizona's voters would choose to change the funding source for the Commission and make the Commission dependent upon a legislative appropriation to carry out its remaining duties, involves a principle quite different from the question posed by section A, whether the voters would choose to end public funding for political campaigns.

¶22      The proponents of Proposition 106 argue that, whatever the language of section C, the effect of that section will be negligible. They point out that the Clean Elections Act mandates that the Commission devote ten percent of the amount derived under A.R.S. § 16-949.A to its duties of voter education. *Id.* § 16-949.C. Therefore, the proponents conclude, the legislature could not appropriate less than the mandated amount for the Commission's voter education activity. Even assuming *arguendo* that the proponents are correct, the fact remains that section C changes the funding source for the Commission's enforcement and administrative duties. Under the terms of the Act, the Commission may use "up to ten percent" of

_____

least one purpose of section C. The description, after setting out the amount of money spent under the Clean Elections Act in 2002, stated: "With severe budget cutbacks an unfortunate reality, this $13 million is better spent on education, healthcare for seniors, and other essential services." *Petition*

15

the amount defined by section 16-949.A for its administrative and enforcement duties. *Id.* § 16-949.B. As adopted by the voters, the Act gave the Commission discretion to decide how much to spend for administration and enforcement, subject only to the limitation that the amount could not exceed ten percent of the available monies.

¶**23** Section C transfers that decision to the legislature, thereby divesting the Commission of its authority to make independent funding decisions. It thus represents an important change to the existing statutory scheme: Whereas the Commission now can itself decide how much to spend on enforcement of election laws, under Proposition 106 the Commission would be required to apply to the legislature for funds to fulfill its enforcement duties, even though the members of the legislature are always potential targets of such enforcement efforts. Arizona's voters surely could adopt such an approach. But because the proposition advanced by section C rests upon a principle quite different from that advanced by section A, Article 21 requires that the voters be afforded the opportunity to consider a constitutional amendment that presents only that decision, not an amendment that joins the separate

---

*Signature Sheets for Proposition 106*, filed with the Arizona Secretary of State.

16

question of whether Arizona should publicly fund political campaigns.

## C.

**¶24**      Section C of Proposition 106 furthers yet another purpose, also unrelated to the purpose and principle underlying section A.  When the voters adopted the Clean Elections Act, they approved a surcharge on all criminal and civil fines and penalties and dedicated those funds to specific purposes defined in the Act.[12]  A.R.S. § 16-954.C.  As noted above, section C would transfer those previously dedicated funds to the state general fund.  Article 21 requires that we ask whether a common principle supports both the proposition that Arizona should prohibit public financing for political campaigns and the proposition that Arizona should impose a significant surcharge on civil and criminal fines to support the general fund.

**¶25**      We cannot conclude from any objective factor that voters favoring one proposition would likely favor the other. No common principle makes it likely that one who votes to abolish public financing of political campaigns also would vote

---

[12]    During 2002, the surcharge accounted for approximately sixty-two percent of the dedicated funds that the Commission received. *See 2002 Annual Report* at 34.

17

to retain a surcharge that provided taxpayer money, as defined in Proposition 106, for those campaigns.[13]

¶26     The voters, of course, retain the right to continue the surcharge and to allow the funds previously dedicated to the Commission to be diverted to the general fund.  If the voters are to be asked to approve the use of this surcharge to increase the general fund, however, they must be given the opportunity to express their opinion through a separate proposed amendment.

**IV.**

¶27     For the forgoing reasons, we affirm the judgment of the Superior Court.


_____
                    Ruth V. McGregor, Vice Chief Justice

CONCURRING:


_____
Charles E. Jones, Chief Justice

---

[13]    A previous initiative measure adopted by Arizona's voters strongly suggests that this state's voters prefer to directly express their views concerning the use of dedicated funds established by the voters.  In 1998, the voters amended the Arizona Constitution to provide that the legislature may "appropriate or divert funds allocated to a specific purpose by an initiative measure approved by a majority of the votes cast thereon" only if the diversion or appropriation of funds furthers the purposes of the initiative and only if approved by a vote of three-fourths of the members of the legislature. Ariz. Const. art. 4, pt. 1, § 1(6)(D).

_____

Rebecca White Berch, Justice


_____

Michael D. Ryan, Justice


_____

Andrew D. Hurwitz, Justice



**H U R W I T Z**, Justice, concurring:

**¶28**    The opinion of the Court faithfully summarizes and correctly applies our precedents concerning the "separate amendment rule" in Article 21, Section 1 of the Arizona Constitution.  The opinion is particularly useful in emphasizing the differences between this constitutional provision and the "single subject" rule applicable to legislation in Article 4, Part 2, Section 13.  Op. ¶¶ 3 – 9.[14]

**¶29**    While I join the Court's opinion, I have substantial doubts about the continued utility of the "common principle or purpose test" derived from *Kerby v. Luhrs*, 44 Ariz. 208, 36 P.2d 549 (1934), and its progeny.  Because that test in part turns on

_____

[14]    Because even the more lenient "single subject" rule of Article 4, Part 2, Section 13 does not apply to legislation proposed by initiative, *Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516, 524 ¶ 35, 1 P.3d 706, 714 (2000), it is clear that if Proposition 106 had offered legislation, rather than a constitutional amendment, the multiple subjects in the

a judicial determination of whether a voter supporting one part of a proposed amendment would "be expected to support the principle of the others," *id*. at 221, 36 P.2d at 554, it involves the Court in a prediction of voter preferences and behavior that is often somewhat subjective and that will subject most proposed multi-faceted constitutional amendments to attack.

¶30      It may well be that a different approach to the separate amendment rule would provide greater certainty in interpretation while still achieving the critical goal of Article 21, Section 1 – making sure that when voters are asked to amend the Constitution, what is before them is a single amendment, not several distinct proposals lumped under one heading.    For example, an approach that focused on such objective factors as whether one proposal *logically* follows from another and is *necessary* for the practical implementation of the first might well provide more predictable adjudication.

¶31      The parties to this case, however, did not argue that we should apply anything but the traditional *Kerby* test, and I am reluctant to consider altering our traditional approach in the absence of briefing and argument on the subject.    For the reasons stated by the Court, Proposition 106 fails the *Kerby*

_____
proposal would not have barred its placement on the general election ballot.

20

test, and I therefore leave for another day whether that test should continue to govern our separate amendment jurisprudence.

_____
Andrew D. Hurwitz, Justice

21