SUPREME COURT OF ARIZONA
EN BANC

| | |
|---|---|
| ARIZONA TOGETHER, an unincorporated association; KAITLIN MEADOWS; ALBERT LANNON; AMALIA ANTONIOLI; FRANK MONTOYA; AL BREZNEY; MAXINE PIATT; PAUL KNOBBE; TERESA HEWITT; GLEN CROMER; and REBECCA MILLER, | ) Arizona Supreme Court<br>) No. CV-06-0277-AP/EL<br>)<br>) Maricopa County<br>) Superior Court<br>) No. CV 2006-010505<br>)<br>) |
| Plaintiffs-Appellants, | ) |
| v. | ) **O P I N I O N**<br>) |
| JANICE K. BREWER, in her official capacity as Secretary of State for the State of Arizona, | )<br>)<br>)<br>)<br>) |
| Defendant-Appellee, | ) |
| and | )<br>) |
| PROTECT MARRIAGE ARIZONA, an unincorporated association, | )<br>)<br>) |
| Real Party in Interest. | )<br>)<br>) |

Appeal from the Superior Court in Maricopa County
The Honorable Douglas L. Rayes, Judge

**AFFIRMED**
_____

GAMMAGE & BURNHAM PLC                                        Phoenix
     By   Lisa T. Hauser
          Mark H. Wagner

And

PERKINS COIE BROWN & BAIN PA                                 Phoenix
     By   Charles A. Blanchard
          Michael T. Liburdi
          Craig A. Morgan

Attorneys for Arizona Together, Kaitlin Meadows, Albert
Lannon, Amalia Antonioli, Frank Montoya, Al Brezney, Maxine
Piatt, Paul Knobbe, Teresa Hewitt, Glen Cromer, and Rebecca
Miller

TERRI SKLADANY, ACTING ARIZONA ATTORNEY GENERAL[1]        Phoenix
     By   Diana L. Varela, Assistant Attorney General
          Emma Lehner Mamaluy, Assistant Attorney General
Attorneys for Janice K. Brewer, Secretary of State for the
State of Arizona

CENTER FOR ARIZONA POLICY                          Scottsdale
     By   Peter A. Gentala
Attorney for Protect Marriage Arizona

And

ALLIANCE DEFENSE FUND LAW CENTER                    Scottsdale
     By   Benjamin W. Bull
          Glen Lavy
          Dale Schowengerdt
Attorneys for Protect Marriage Arizona


INSTITUTE FOR JUSTICE                               Phoenix
     By   Timothy D. Keller
          Jennifer M. Perkins
Attorneys for Amicus Curiae Institute for Justice Arizona
Chapter

COPPERSMITH GORDON SCHERMER OWENS & NELSON PLC       Phoenix
     By   Andrew S. Gordon
Attorney for Amici Curiae Peter W. Likins and Phil Gordon
_____

**M c G R E G O R**, Chief Justice

¶1      The question presented is whether Proposition 107, a
constitutional amendment proposed by voter initiative, complies
with the separate amendment rule of Article 21, Section 1 of the

_____

[1]   Attorney General Goddard recused himself from this matter.
Accordingly, Terri Skladany, the Chief Assistant Attorney
General, serves as Acting Attorney General.

Arizona Constitution. Proposition 107 would amend the constitution by adding a new Article 30 defining "marriage" and prohibiting the state and its political subdivisions from creating or recognizing a legal status for unmarried persons similar to that of marriage.[2] The appellants, opponents of Proposition 107, brought this action pursuant to Arizona Revised Statutes (A.R.S.) section 19-122.C (2002) to enjoin the Secretary of State from placing the measure on the ballot in the 2006 general election. Appellant Arizona Together argues that Proposition 107 does not constitute a single amendment, but rather is a composite of three unrelated provisions. In particular, Arizona Together asserts that, if enacted, Proposition 107 not only would define marriage but also could (1) prohibit same sex marriages, (2) prohibit civil unions and domestic partnerships, and (3) prohibit the state and its

---

[2]    Proposition 107 provides:

> TO PRESERVE AND PROTECT MARRIAGE IN THIS STATE, ONLY A UNION BETWEEN ONE MAN AND ONE WOMAN SHALL BE VALID OR RECOGNIZED AS A MARRIAGE BY THIS STATE OR ITS POLITICAL SUBDIVISIONS AND NO LEGAL STATUS FOR UNMARRIED PERSONS SHALL BE CREATED OR RECOGNIZED BY THIS STATE OR ITS POLITICAL SUBDIVISIONS THAT IS SIMILAR TO THAT OF MARRIAGE.

Ariz. Sec'y of State, *2006 General Election Ballot Measures*, Proposition 107, § 1 (2006), *available at* http://www.azsos.gov/election/2006/general/ballotmeasures.htm (follow ballot number 107 full text hyperlink) [hereinafter Proposition 107].

3

political subdivisions from conferring benefits and rights on domestic partners. After a hearing, the superior court concluded that Proposition 107 constitutes a single amendment in light of the test established by this Court in *Kerby v. Luhrs*, 44 Ariz. 208, 36 P.2d 549 (1934). On August 31, 2006, we entered an order affirming the judgment of the superior court, with this opinion to follow.[3]

## I.

¶2     Whether a voter initiative complies with the separate amendment rule of Article 21, Section 1 presents a question of law, which we review de novo. *See Clean Elections Inst., Inc. v. Brewer*, 209 Ariz. 241, 243 ¶ 2, 99 P.3d 570, 572 (2004).

## A.

¶3     The Arizona Constitution requires that "[i]f more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately." Ariz. Const. art. 21, § 1. "The clear import of this provision is that voters must be allowed to express their separate opinion as to each proposed constitutional amendment." *Clean Elections,* 209 Ariz. at 244 ¶ 7, 99 P.3d at 573. The

---

[3]     On November 7, 2006, the voters rejected Proposition 107. Ariz. Sec'y of State, *State of Arizona Official Canvass* at 15 (Dec. 4, 2006), *available at* http://www.azsos.gov/election/2006/General/Canvass2006GE.pdf.

4

separate amendment rule serves a gatekeeping function by protecting the integrity of the constitutional amendment process from the "pernicious practice of 'log-rolling.'" *Kerby*, 44 Ariz. at 214, 36 P.2d at 551. As we have often noted, our constitution requires that "[c]hanges suggested thereto should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire." *Id.* at 221, 36 P.2d at 554; *see also Clean Elections*, 209 Ariz. at 244 ¶ 9, 99 P.3d at 573; *Korte v. Bayless*, 199 Ariz. 173, 177 ¶ 12, 16 P.3d 200, 204 (2001); *Slayton v. Shumway*, 166 Ariz. 87, 90, 800 P.2d 590, 593 (1990); *Tilson v. Mofford*, 153 Ariz. 468, 471, 737 P.2d 1367, 1370 (1987); *State ex rel. Jones v. Lockhart*, 76 Ariz. 390, 396, 265 P.2d 447, 451 (1953).

¶4      This Court is obligated to ensure that voters receive an opportunity to cast separate votes for separate amendments. At the same time, we must not apply the separate amendment rule in a manner that unduly encumbers the right of the people to amend the constitution. Accordingly, we have consistently sought to strike a balance between allowing voters a chance to express separate opinions on proposed amendments and ensuring that "complex solutions to modern legislative problems" are not

precluded by "an unduly narrow reading" of the separate amendment rule. *Korte*, 199 Ariz. at 177 ¶ 13, 16 P.3d at 204.

**¶5**      We first enunciated the test to maintain this balance in *Kerby*:

> If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition [of Article 21, Section 1].

44 Ariz. at 221, 36 P.2d at 554.    Our subsequent application of the separate amendment rule has distilled the general language in *Kerby*.    We now ask whether the provisions of a proposed amendment "are sufficiently related to a common purpose or principle that the proposal can be said to 'constitute a consistent and workable whole on the general topic embraced,' that, 'logically speaking, . . . should stand or fall as a whole.'"    *Korte*, 199 Ariz. at 177 ¶ 10, 16 P.3d at 204 (footnote omitted) (quoting *Kerby*, 44 Ariz. at 221, 36 P.2d at 554).

**¶6**      This "common purpose or principle" test requires us to analyze two components.    First, the proposed amendment's

6

provisions must be *topically related*: All the provisions must embrace the same "general topic." *See Kerby*, 44 Ariz. at 221, 36 P.2d at 554. Second, the provisions must be *sufficiently interrelated* so as to form a consistent and workable proposition that "logically speaking . . . should stand or fall as a whole." *Id.* If the provisions of a proposal exhibit both topicality and interrelatedness, we can conclude that the provisions have a common purpose or principle and therefore comply with the mandate of Article 21, Section 1.

**B.**

¶7        The parties agree that Proposition 107, despite being drafted as a single sentence, can be divided into two provisions. The first requires that "only a union between one man and one woman shall be valid or recognized as a marriage by this state or its political subdivisions." Proposition 107, § 1. The second provides that "no legal status for unmarried persons shall be created or recognized by this state or its political subdivisions that is similar to that of marriage." *Id.* The initial question, then, is whether both provisions embrace the same general topic.

¶8        We conclude that the provisions are topically related. The text of Proposition 107 identifies its purpose as being to "preserve and protect marriage in this state." *Id.* The first provision adopts an exclusive definition of marriage, while the

7

second emphasizes that the state cannot circumvent the definition by conferring any other marriage-like legal status upon unmarried individuals. Consequently, both provisions of Proposition 107 embrace the same general topic.[4]

¶9     This conclusion does not end our inquiry. The separate amendment requirement is not satisfied by every "initiative that demonstrates a topical relationship among its various provisions." *Korte*, 199 Ariz. at 176 ¶ 10, 16 P.3d at 203. In *Kerby*, for instance, three separate provisions of a proposed amendment embraced the "broader general subject . . . of taxation." 44 Ariz. at 222, 36 P.2d at 554. The proposition as a whole nevertheless lacked sufficient interrelatedness and therefore failed to satisfy the separate amendment rule. *See id.* at 222, 36 P.2d at 554-55. Accordingly, we must also determine whether the provisions here are sufficiently interrelated.

## C.

---

[4]     Arizona Together argues that the provisions of the proposed amendment do not embrace the same general topic because inclusion of the phrase "legal status" in Proposition 107 will prohibit the state and its political subdivisions from conferring benefits and rights on domestic partners, while Protect Marriage Arizona asserts the proposition will not have that effect. We need not determine conclusively the hypothetical substantive impact of the proposition, which the voters ultimately rejected at the polls. We do note that when alternative constructions of proposed constitutional amendments are available, courts will generally adopt a construction that avoids constitutional difficulty under the separate amendment rule. *See Slayton*, 166 Ariz. at 92, 800 P.2d at 595.

8

**1.**

¶10     In assessing whether the provisions of a proposed amendment are sufficiently interrelated, we do not apply "a strict rule that all components of a provision be logically dependent on one another." *Korte*, 199 Ariz. at 176 ¶ 10, 16 P.3d at 203. Instead, we measure the provisions against objective factors, such as

> whether various provisions are facially related, whether all the matters addressed by an initiative concern a single section of the constitution, whether the voters or the legislature historically has treated the matters addressed as one subject, and whether the various provisions are qualitatively similar in their effect on either procedural or substantive law.

*Id.* at 177 ¶ 11, 16 P.3d at 204 (citations omitted); *see also Clean Elections*, 209 Ariz. at 244-45 ¶ 12, 99 P.3d at 573-74 (listing factors); *Taxpayer Prot. Alliance v. Arizonans Against Unfair Tax Schemes*, 199 Ariz. 180, 181 ¶ 4, 16 P.3d 207, 208 (2001) (same). On balance, we find sufficient interrelatedness between the provisions that, in conjunction with their topicality, allows us to conclude that they are sufficiently related to a common purpose or principle to satisfy the separate amendment rule.

¶11     We have already noted that the language of both provisions addresses the definition of "marriage" and the purpose of both provisions is to preserve and protect marriage.

Accordingly, the text of the provisions of Proposition 107 demonstrates a facial relationship.

¶12      In addition, the two provisions of Proposition 107, as proposed, involve a single section of the constitution. No section of the Arizona Constitution presently purports to define marriage.[5] Therefore, Proposition 107 would operate as the only provision of the constitution addressing this subject. Because both provisions of Proposition 107 concern a single proposed article and would therefore operate in tandem as a unified section of the constitution, this factor helps to demonstrate the interrelated nature of the provisions of Proposition 107.

¶13      Because the Arizona Constitution has never defined marriage, the historical treatment of these provisions offers little guidance. Arizona Together, however, asks us to look to two other sources. It first asks us to consider the treatment of marriage and domestic partnerships afforded by the legislatures and voters of various sister states. In addition, Arizona Together encourages us to regard the Arizona Legislature's treatment of marriage and domestic partnerships in separate parts of the Arizona Revised Statutes as evidence that

---

[5]     Although the second paragraph of Article 20 of the Arizona Constitution provides that "[p]olygamous or plural marriages, or polygamous cohabitation, are forever prohibited within this State," this provision does not itself define marriage and does not affect our analysis of whether Proposition 107 satisfies the separate amendment rule.

10

Arizona has historically treated marriage and domestic partnerships separately. Neither argument persuades us that Arizona has historically treated the subjects of these two provisions differently as a constitutional matter.

¶14      First, even if we were to rely on the opinions of voters and legislatures in other states, the argument Arizona Together submits actually demonstrates that some other states have treated marriage and domestic partnerships as one subject. *See, e.g.,* Cal. Fam. Code § 297.5(a) (West Supp. 2007) (giving registered domestic partners the "same rights, protections, and benefits . . . *as are granted to and imposed upon spouses*" (emphasis added)); Vt. Stat. Ann. tit. 15, § 1204(a) (2002) ("Parties to a civil union shall have all the same benefits, protections and responsibilities under law . . . *as are granted to spouses in a marriage*." (emphasis added)). Moreover, our inquiry in a separate amendment challenge must focus not upon the historical treatment of the relevant subject in the laws of other states, but rather upon the historical treatment of the subject in the Arizona Constitution. *See Lockhart*, 76 Ariz. at 397, 265 P.2d at 451-52 (discussing the voters' historical treatment of constitutional provisions concerning the legislature).

¶15      Our focus upon the treatment afforded by the Arizona Constitution leads us to conclude that Arizona Together's

11

reliance on various Arizona statutes concerning marriage and domestic partner rights does not advance our inquiry. Merely showing that the legislature has addressed an issue in various places in Arizona's statutory scheme fails to demonstrate that the specific concerns addressed by each statute would not constitute a "single subject *in constitutional amendments*." *See id.* at 397, 265 P.2d at 452 (emphasis added). Because Arizona has not historically treated the definition of marriage in the state constitution, we find little guidance from this factor.

¶16 We do find guidance, however, from the factor that instructs us to consider whether provisions are qualitatively similar in their effect on the law. *Cf. Slayton*, 166 Ariz. at 92, 800 P.2d at 595 (concluding that proposed amendment containing eleven provisions, all of which were deemed to be both "procedural" and relating to "victims' rights," satisfied the separate amendment rule). In *Slayton*, we considered a separate amendment challenge to a proposition popularly known as the "Victims' Rights Initiative." *Id.* at 88, 800 P.2d at 591. The initiative contained eleven subsections, the first ten of which enumerated "certain procedural protections to, and rights of, those who are victims of crime," and were in uncontested compliance with the separate amendment rule. *Id.* The challengers, however, argued that the eleventh subsection was unlike the other ten because it conferred judicial rulemaking

authority upon the legislature, rather than the Court, and thus violated separation of powers principles. *Id.* at 88-89, 800 P.2d at 591-92. We rejected the challengers' argument and instead adopted the interpretation advanced by the initiative's proponents, and thus narrowly construed the eleventh subsection "to mean the legislature will have the power to amend or repeal rules [only] for the limited purpose of protecting victims' rights." In light of this construction, "subsection 11 is more than 'reasonably related' to the rest of the proposition; it depends on the rest of the proposition for its meaning and effect, and it would mean little or nothing if enacted in isolation." *Id.* at 92, 800 P.2d at 595. Hence, the separate amendment rule was not violated because the eleventh subsection dealt "only with procedural rules pertaining to victims and not with the substantive general subject of the rulemaking power." *Id.* Consequently, all eleven subsections were "qualitatively similar in their effect on . . . procedural . . . law." *See Korte*, 199 Ariz. at 177 ¶ 11, 16 P.3d at 204.

¶17 In this case, both provisions affect substantive law in the same way; both pertain to the law surrounding the definition of marriage. The first provision sets forth a definitional framework of marriage, which the second provision makes exclusive in terms of "legal status." The provisions of the proposed amendment, while not logically dependent on one

13

another, clearly share a logical relationship and comprise a unified pronouncement on the state's constitutional understanding of marriage. Because both provisions affect substantive law, pertain to the subject of the definition of marriage, and derive meaning and effect from the mandates contained in the other provision, we conclude that they are qualitatively similar in their effect on the substantive law of marriage. *Cf. Slayton*, 166 Ariz. at 92, 800 P.2d at 595. As a result, this factor firmly encourages a finding that the two provisions of Proposition 107 are sufficiently interrelated.

### 2.

¶18     Since our decision in *Kerby*, we have included a "reasonable voter" analysis as one factor to consider in determining whether a common purpose or principle joins the provisions of a proposed amendment. *See Kerby*, 44 Ariz. at 221, 36 P.2d at 554. Arizona Together argues that Proposition 107 does not meet this criterion and supports its argument by referring to polling data that purportedly demonstrate that a reasonable voter would not simultaneously support defining marriage as a union between only one man and one woman and support prohibiting the state from creating a legal status for unmarried persons similar to marriage. For the reasons set forth below, we will no longer consider the reasonable voter factor when evaluating separate amendment rule challenges.

14

¶19     As part of our separate amendment rule jurisprudence, we have previously considered whether a "voter supporting [one part of an amendment] would reasonably be expected to support the principle of the [other parts of the amendment]." *Id.* We have never applied this reasonable voter inquiry to invalidate an initiative based solely upon this Court's prediction of voter behavior, however, and we have never regarded this factor as a separate test for determining whether provisions advance a common purpose or principle. *Korte*, 199 Ariz. at 177 ¶ 11, 16 P.3d at 204. Rather, we have used this factor only as an "alternate approach" to assessing whether a common purpose or principle joins various provisions. *Id.*

¶20     After reviewing our cases interpreting the separate amendment rule, we are convinced the reasonable voter analysis has shed little light on whether a common purpose or principle exists. Generally, when we have found that a common purpose or principle joins the various provisions of an amendment, we have also found that a reasonable voter is likely to support all the provisions of the amendment. *See id.* at 177 ¶ 11, 178 ¶¶ 14-17, 16 P.3d at 204, 205 (rejecting argument that voters could not be reasonably expected to support all the provisions of an amendment upon finding that proposal satisfied objective factors); *Slayton*, 166 Ariz. at 92, 800 P.2d at 595 (concluding that voters "might reasonably be expected" to support an entire

15

amendment that we had already found to be a "'consistent and workable whole on the general topic' of victims' rights and protections" (quoting *Kerby*, 44 Ariz. at 221, 36 P.2d at 554)); *Tilson*, 153 Ariz. at 472, 737 P.2d at 1371 ("As the purpose of each of the propositions in the proposed amendment is the same . . . voters reasonably can be expected to vote for or against the amendment as a whole."); *Lockhart*, 76 Ariz. at 397, 265 P.2d at 452 (concluding that the "people of this state" could not have been acting "unreasonably" after finding that the provisions in question "both relate to, and are germane to, one general subject"). Conversely, when no common purpose or principle underlies a proposed amendment, we have concluded that "voters favoring one proposition would [not] likely favor the other." *See Clean Elections*, 209 Ariz. at 247 ¶ 25, 99 P.3d at 576; *see also Kerby*, 44 Ariz. at 221-22, 36 P.2d at 554-55 (declaring, after finding no interrelatedness among the provisions in question, that voters would "have widely different opinions" on the amendment). Perhaps most telling, we have never found that a reasonable voter was unlikely to support an entire amendment if the amendment otherwise satisfied the separate amendment rule, or vice versa.

¶21     Nevertheless, as our previous cases reveal, litigants have persistently attacked proposed amendments under the reasonable voter approach by using a variety of arguments, most

16

of which asked the Court to speculate about the behavior of the electorate at some future time. *See, e.g., Korte*, 199 Ariz. at 177 ¶ 11, 178 ¶ 14, 16 P.3d at 204, 205 (rejecting argument that voters could not be reasonably expected to support all provisions of the amendment); *Slayton*, 166 Ariz. at 92, 800 P.2d at 595 (acknowledging that there was "still some question" as to whether voters "might reasonably be expected to support" the entire amendment). Notwithstanding our admonition against excessive reliance on the reasonable voter assessment, *see Korte*, 199 Ariz. at 177 ¶ 11, 16 P.3d at 204, litigants have continued to use the reasonable voter as a proxy for analysis of objective factors such as those we summarized in *Korte*. Because it appears that the reasonable voter inquiry has led to substantial confusion among litigants, has added nothing to assure consistency in outcome, and provides little more than a tautological justification for a conclusion best reached by applying the *topicality* and *interrelatedness* approach to assess whether a common purpose or principle joins the provisions of a proposed amendment, we can no longer justify using the reasonable voter alternative as a part of our separate amendment jurisprudence. *Cf. Derendal v. Griffith*, 209 Ariz. 416, 423-24 ¶¶ 28-32, 104 P.3d 147, 154-55 (2005) (abandoning continued reliance on the "moral quality test" because it was "subjective and ambiguous, [and] inconsistent outcomes resulted").

¶22     The parties here have suggested no other objective factors that we should consider in this case, and none are apparent to the Court.  For the reasons set forth above, we conclude that the two provisions of Proposition 107 exhibit sufficient interrelatedness to satisfy the second component of the *Kerby* test.

### 3.

¶23     Because we find that the two provisions contained in Proposition 107 share both topicality and interrelatedness, we hold that the provisions "are sufficiently related to a common purpose or principle that the proposal can be said to 'constitute a consistent and workable whole on the general topic embraced,' that, 'logically speaking, . . . should stand or fall as a whole.'"  *Korte*, 199 Ariz. at 177 ¶ 10, 16 P.3d at 204 (footnote omitted) (quoting *Kerby*, 44 Ariz. at 221, 36 P.2d at 554).

### II.

¶24     Amicus Institute for Justice urges us to adopt an entirely different approach to determine whether a proposed amendment satisfies the separate amendment rule.  Amicus argues that Article 21, Section 1 merely imposes a procedural rule that instructs the Secretary of State as to the proper method to use in preparing ballots for proposed constitutional amendments. Under this interpretation, the separate amendment rule lacks any

"substantive" component and does not require that we consider whether the various provisions of a proposed amendment further a common purpose or principle. We reject this interpretation.

¶25 Contrary to the argument made by amicus, history does not support a strictly procedural understanding of the separate amendment rule. Article 21, Section 1 of the Arizona Constitution was originally submitted as Proposition Number 14 at the Arizona Constitutional Convention. *See The Records of the Arizona Constitutional Convention of 1910*, at 686, 1062 (John S. Goff ed., 1991). The proposition was designed to model Arizona's method for amending its constitution after that previously adopted by South Dakota. *Id.* at 686. During discussion of the matter at the Constitutional Convention, Delegate Cunniff noted:

> In examining the mode of amendments in the various constitutions, the South Dakota form seemed to those of us who worked on this proposition to be as carefully drawn up and as unmistakably a presentation of the idea that our constitution wished to convey as we could find. Into that the initiative method of proposing an amendment to the constitution was inserted, in the same manner (and following the same plan) by which an amendment to the constitution was worked out in our initiative and referendum article covering the method of initiating laws. In that way it conforms to measures that we have already adopted.

*Id.*

¶26 At the time Mr. Cunniff and the other delegates who worked on the separate amendment proposition determined that the

19

South Dakota provision conveyed the idea the framers wished to adopt, South Dakota courts already had held that the provision required substantive judicial review to decide whether proposed amendments constituted separate amendments. *See State ex rel. Adams v. Herried*, 72 N.W. 93, 96-97 (S.D. 1897) (adopting the substantive Wisconsin view of the separate amendment provision). Nor did South Dakota stand alone in its interpretation of this provision.[6] We impute to the framers of the Arizona Constitution the contemporary understanding of, and judicial construction given to, the provision they adopted, particularly because they singled out the South Dakota approach and copied it virtually verbatim into the Arizona Constitution. *See, e.g., Barrows v. Garvey*, 67 Ariz. 202, 209, 193 P.2d 913, 917 (1948) (presuming that "the framers of our constitution were conversant with and

---

[6] Before the South Dakota Supreme Court decided *Herried*, other jurisdictions had also given their separate amendment clauses a similar construction. *See, e.g., State ex rel. Hudd v. Timme*, 11 N.W. 785, 789-91 (Wis. 1882) (concluding that amendments containing various propositions that "have different objects and purposes in view" would violate section 1, article 12 of the Wisconsin Constitution, which requires that voters be permitted to "vote for or against such amendments separately"); *cf. State ex rel. Morris v. Mason*, 9 So. 776, 800 (La. 1891) (considering whether the various provisions of proposed legislation would constitute "more than one amendment" to the constitution in violation of a constitutional provision requiring that amendments be presented to the voters in a manner allowing them to vote on each amendment separately). The decision in *Timme* also provided support for our *Kerby* opinion, which adopted a substantive approach. *See Kerby*, 44 Ariz. at 216-21, 36 P.2d at 552-54.

20

intended to adopt also the construction that had been placed upon [a] provision" by the courts of the jurisdiction from which the provision was taken "prior to its incorporation into the Arizona Constitution").

¶27 In addition, between the time that South Dakota construed its provision and the time Arizona adopted its constitution, several other jurisdictions had given corresponding constructions to parallel constitutional provisions. *See, e.g., State ex rel. McClurg v. Powell*, 27 So. 927, 932 (Miss. 1900) (holding that "there were at least four amendments submitted to the people" in a single proposition and "for that reason the amendments were not submitted in accordance with . . . the constitution, and, notwithstanding the action of the legislature in inserting them in the constitution, are null and void, and form no part of said constitution"); *see also People ex rel. Elder v. Sours*, 74 P. 167, 176-78 (Colo. 1903) (citing with approval the approach adopted in *Timme*, 11 N.W. at 789-91, and *Herried*, 72 N.W. at 96-97); *Hammond v. Clark*, 71 S.E. 479, 484-86 (Ga. 1911) (evaluating whether a proposed amendment constituted more than one amendment, thereby violating a provision of the state constitution requiring that voters "vote on each amendment separately").

¶28 Amicus further argues that giving a substantive interpretation to the separate amendment rule necessarily

21

undermines the fundamental role the voter initiative plays in Arizona. As already noted, however, the framers clearly meant to incorporate both the power of initiative and the South Dakota approach to amending the constitution. *See The Records of the Arizona Constitutional Convention of 1910*, at 686.[7]

¶29     Moreover, we find it compelling that, while amicus has cited no jurisdiction that has adopted its proposed interpretation, other jurisdictions with similar constitutional provisions share Arizona's substantive approach.[8]     Based upon

---

[7]     Other states that, like Arizona, give voters the power of initiative, also construe their separate amendment rules in a substantive manner. *See, e.g., League of Or. Cities v. State*, 56 P.3d 892, 904-05 (Or. 2002) (interpreting Or. Const. art. XVII, § 1); *cf. Legislature v. Eu*, 816 P.2d 1309, 1320-21 (Cal. 1991) (interpreting Cal. Const. art. II, § 8).

[8]     *See, e.g., Carter v. Burson*, 198 S.E.2d 151, 156 (Ga. 1973) (discussing the state's constitutional separate amendment rule and acknowledging its substantive component); *State ex rel. Kemp v. City of Baton Rouge*, 40 So. 2d 477, 481 (La. 1949) (concluding that proposed amendments must have "*one purpose, one design*" to satisfy the separate vote requirement contained in the state constitution); *Andrews v. Governor of Md.*, 449 A.2d 1144, 1150 (Md. 1982) (noting that the state's separate vote requirement dictates that when a provision proposes changes that "deal with different or dissimilar subjects and seek to reach different objectives which require amendment, then the legislature must submit these proposals to the electorate so as to allow the electors to vote upon each separately"); *Fugina v. Donovan*, 104 N.W.2d 911, 914 (Minn. 1960) (explaining that the separate vote requirement in the state constitution requires courts to assess whether there is a "rational relationship in purpose, plan, or subject of two or more propositions"); *Marshall v. State ex rel. Cooney*, 975 P.2d 325, 331-32 ¶ 24 (Mont. 1999) (concluding that a proposed amendment that amended three separate parts of the state constitution violated the "separate vote" requirement of the constitution); *Munch v. Tusa*,

22

this wealth of historical and contemporary authority, we

---

300 N.W. 385, 389 (Neb. 1941) (deciding whether the provisions of a proposed amendment have a "natural and necessary connection with each other," and are a "part of one general subject"); *State ex rel. Clark v. State Canvassing Bd.*, 888 P.2d 458, 461 (N.M. 1995) (noting that the separate vote requirement in the state constitution is designed to prevent the joinder "of two or more independent measures" in a single proposal); *State ex rel. Roahrig v. Brown*, 282 N.E.2d 584, 586 (Ohio 1972) ("[A] proposal consists of one amendment to the Constitution only so long as each of its subjects bears some reasonable relationship to a single *general* object or purpose."); *In re Initiative Petition No. 360, State Question No. 662*, 879 P.2d 810, 816-17 (Okla. 1994) (relying on *Kerby* in construing the state's constitutional requirement of a separate vote on each proposed amendment); *League of Or. Cities*, 56 P.3d at 904 ("[T]o determine whether a measure denominated as a single amendment actually contained two or more amendments for constitutional purposes, a court must determine whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related." (internal quotation marks omitted)); *Milwaukee Alliance Against Racist and Political Repression v. Elections Bd.*, 317 N.W.2d 420, 425-26 (Wis. 1982) (reaffirming the substantive interpretation of the separate vote requirement in the state constitution, as explained in *Timme*, 11 N.W. 785); *see also Kerby*, 44 Ariz. at 217-18, 36 P.2d at 553 (collecting additional cases from North Dakota, Iowa, Washington, Mississippi, and Idaho); *cf. Eu*, 816 P.2d at 1320 (acknowledging a substantive role for the state's "single-subject requirement"); *In re Proposed Ballot Initiative on Parental Rights*, 913 P.2d 1127, 1130-31 (Colo. 1996) (discussing the state's constitutional single subject requirement for proposed amendments); *Advisory Opinion to the Att'y Gen. re Term Limits Pledge*, 718 So. 2d 798, 802 (Fla. 1998) (declaring that in order to "comply with the single-subject requirement" of the state constitution, "a proposed amendment must manifest a 'logical and natural oneness of purpose'" (quoting *Fine v. Firestone*, 448 So. 2d 984, 990 (Fla. 1984))); *Coal. for Political Honesty v. State Bd. of Elections*, 415 N.E.2d 368, 379-82 (Ill. 1980) (articulating a substantive approach to ensuring that unrelated questions are not combined in a single proposition); *Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 830-31 (Mo. 1990) (explaining that courts must "scrutinize the proposal to see if all matters included relate to a readily identifiable and reasonably narrow central purpose" to ensure compliance with the state constitution's single subject rule).

conclude that this Court correctly interpreted the separate amendment rule of the Arizona Constitution as imposing substantive limits on proposed amendments submitted to the voters.

**III.**

¶30     For these reasons, we affirm the judgment of the superior court.

_____
                    Ruth V. McGregor, Chief Justice

CONCURRING:

_____
Rebecca White Berch, Vice Chief Justice

_____
Michael D. Ryan, Justice

_____
Andrew D. Hurwitz, Justice

_____
W. Scott Bales, Justice

**H U R W I T Z**, Justice, concurring

**I.**

¶31     I have previously suggested that our separate amendment rule case law needed clarification. *Clean Elections Inst., Inc. v. Brewer*, 209 Ariz. 241, 248 ¶¶ 28-30, 99 P.3d 570,

77 (2004) (Hurwitz, J., concurring). Today's opinion undertakes that task and admirably clears out a considerable amount of our jurisprudential underbrush.

¶32     Today the Court appropriately returns to first principles – the test articulated more than seventy years ago in *Kerby v. Luhrs*, 44 Ariz. 208, 36 P.2d 549 (1934). That test, as the Court explains, has two components. First, all provisions of a proposed amendment must relate to the same "general topic." *Id*. at 221, 36 P.2d at 554. This is simply a test of germaneness. Although most proposed constitutional amendments will easily pass through this initial screen, a proposed amendment with separate provisions relating to, for instance, education and worker's compensation would plainly fail this test.

¶33     But *Kerby* requires more. In that case, the various provisions of the proposed constitutional amendment all related to the same general topic – taxation. This Court, however, found that the proposal did not pass muster under the separate amendment rule because the various provisions were not sufficiently interrelated. This second part of the *Kerby* test requires that "*logically speaking*," the various provisions "should stand or fall as a whole." *Id*. (emphasis added).

¶34     Our cases have generally applied this second prong of the *Kerby* test in a straightforward fashion. *Tilson v. Mofford*,

25

153 Ariz. 468, 737 P.2d 1367 (1987), is a paradigm. *Tilson* involved a proposed constitutional amendment with four provisions authorizing the Legislature to regulate tort damages. The Court first noted that the various propositions "all related to the same topic of tort damages." *Id*. at 472, 737 P.2d at 1371. The first part of the *Kerby* test – topicality – was thus satisfied. The Court then went on to note that the various provisions in the amendment "all *logically related* to each other." *Id.* (emphasis added).

¶35      *Slayton v. Shumway*, 166 Ariz. 87, 800 P.2d 590 (1990), is to the same effect. In upholding an initiative involving victims' rights against a separate amendment rule challenge, the Court again applied the two-step *Kerby* analysis. It concluded that all provisions of the initiative dealt with the same topic – "victims' proposals." *Id.* at 92, 800 P.2d at 595. This satisfied the requirement of topicality. The Court also dealt with the argument that one provision of the proposed amendment, which gave the Legislature the power to promulgate rules relating to victims' rights, was in reality a separate amendment and thus violated Article 21, Section 1. The Court rejected that argument because it agreed with the proponents of the initiative that this provision was "more than 'reasonably related' to the rest of the proposition." *Id*. This satisfied the second prong of the *Kerby* test.

¶36     In this case, there is no doubt that the two parts of the *Kerby* test are satisfied. As the Court notes, both provisions of Proposition 107 relate to the same general topic – marriage. Op. ¶ 8. And, it is also clear that the two provisions have a "logical relationship." *Id*. ¶ 17. One provision defines marriage as only being between a man and a woman; the second enforces the first by preventing governmental agencies from enacting marriage substitutes – relationships substantively identical to marriage but called by a different name.

¶37     To be sure, the second provision in the initiative before us today is not *necessarily* required by the first. It is quite possible to limit the institution of marriage to persons of different gender while allowing same-sex couples to enter into marriage-like relationships. But *Kerby* does not require that various provisions of a proposal all be required by the others. If that were the case, the initiative in *Slayton*, to use but one example, would not have passed muster; it was not *necessary* to extend rule-making power to the Legislature to protect victims' rights. But it was logical and reasonable to do so, and the rule-making provision therefore met the interrelatedness test. The provisions here also do so.

¶38     I therefore concur in the Court's conclusion that Proposition 107 does not violate the separate amendment rule. I write separately to address two points briefly.

## II.

## A.

¶39     The Court's conclusion that the two provisions of Proposition 107 "share a logical relationship," Op. ¶ 17, more than suffices to establish the interrelationship required by the second prong of the *Kerby* test. That conclusion should end the analysis. I would leave for another day the question of whether in some future case the second prong could alternatively be satisfied by establishing one of the four "objective factors" listed in *Korte v. Bayless*, 199 Ariz. 173, 177 ¶ 11, 16 P.3d 200, 204 (2001), or by some other showing. *See* Op. ¶¶ 10-17.

¶40     In my view, *Korte* did not correctly state or apply the *Kerby* interrelatedness test. As Chief Justice Zlaket cogently noted in dissent, there was simply no logical or reasonable relationship among many of the provisions of the proposed amendment at issue in *Korte*. 199 Ariz. at 179-80 ¶¶ 19-26, 16 P.3d at 206-07 (Zlaket, C.J., dissenting). For example, one provision of the proposed amendment allowed long-term leases of grazing land without public auction while another permitted school districts to obtain trust land at no cost. *Id.* at 179 ¶ 20, 16 P.3d at 206. The *Korte* majority did not find these

28

provisions logically related to each other or to any other provision of the subject initiative; it instead concluded that the various provisions constituted a "multifaceted approach" to the complex issue of managing state lands wisely and thus had a single purpose. *Id*. at 178 ¶ 15, 16 P.3d at 205. But such can be said of virtually any proposed constitutional provision that meets the topicality prong of the *Kerby* test – each provision can be viewed as one facet of improving the constitution's treatment of that topic or solving a complex problem.

¶41    I think that the second prong of the *Kerby* test requires more - a reasonable or logical relationship of the various provisions *with each other*, and not simply with the broader topic that they cover. It is this interrelatedness which, in the words of *Kerby*, ensures that "logically speaking, they should stand or fall as a whole," 44 Ariz. at 221, 36 P.2d at 554, so that the provisions form one amendment, not several.

¶42    In finding the two provisions of Proposition 107 sufficiently interrelated to pass separate amendment rule scrutiny, the Court today cites language in *Korte* suggesting that the separate amendment rule is satisfied when "the various provisions are qualitatively similar in their effect on either procedural or substantive law." Op. ¶¶ 10, 16-17. *Korte* in turn cited *Slayton* in support of this formulation, *Korte*, 199 Ariz. at 177 ¶ 11, 16 P.3d 204, but this language does not

appear in *Slayton*, nor do I believe that it accurately characterizes the analysis in *Slayton*. Rather, as noted above, I think that *Slayton* straightforwardly applied the topicality/logical relationship test set forth in *Kerby*.

¶43    A great virtue of the Court's decision today is the return to the historic *Kerby* test. Because a logical relationship between two provisions plainly satisfies the second prong of that test, I would not today attempt to tease out of our post-*Kerby* cases other "objective factors" establishing interrelationship, and I am particularly reluctant to use *Korte* as an avatar.

**B.**

¶44    Perhaps the most useful aspect of the Court's opinion is its interment of the "reasonable voter" test. Op. ¶¶ 18-20. I have previously noted my discomfort with that test, which requires "a judicial determination of whether a voter supporting one part of a proposed amendment would 'be expected to support the principle of the others'" and thus "involves the Court in a prediction of voter preferences and behavior that is often somewhat subjective." *Clean Elections*, 209 Ariz. at 248 ¶ 29, 99 P.3d at 577 (Hurwitz, J., concurring) (quoting *Kerby*, 44 Ariz. at 221, 36 P.2d at 554). Moreover, the test is in some ways unrelated to the true purpose of the separate amendment rule. It may be empirically true, for example, that all voters

who oppose gun control also oppose trade with China. Yet these common preferences would not suffice to protect a constitutional amendment addressing both issues from an attack under Article 21, Section 1.

**¶45**    As the Court notes, our past cases applying the reasonable voter test have also relied on other parts of the *Kerby* rubric in determining whether a particular proposal satisfied the separate amendment rule. Op. ¶ 20. Whether each of those cases was correctly decided is not before us today, and there is no reason to revisit each of our prior opinions to speculate whether they would have come out the same way in the absence of the reasonable voter test. But, at the very least, our past focus on the mythical reasonable voter has required us to engage in a predictive exercise for which judges are ill-suited and which had the potential of producing inconsistent results. By limiting our analysis to two far more objective factors – topicality and interrelatedness – the Court's opinion should add greater predictability to our future separate amendment rule jurisprudence.

_____

Andrew D. Hurwitz, Justice

31